STATE

v.

Mark A. HALLENBECK.

No. 2003–340–C.A.

Supreme Court of Rhode Island.

July 13, 2005.

Jane M. McSoley, Providence, for Plaintiff.

Thomas F. Connors, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

SUTTELL, Justice.

The defendant, Mark A. Hallenbeck, appeals from a conviction of manslaughter for the stabbing death of Glenn Petersen at the Warwick Mall in the early morning of May 30, 2001. Indicted for murder under G.L. 1956 §§ 11–23–1 and 11–23–2, the defendant was tried before a jury in October 2002. After eight days of testimony and more than two days of deliberations, the jury acquitted the defendant of murder, but returned a guilty verdict on the lesser-included offense of manslaughter. The trial justice later denied the defendant's motion for a new trial, remarking that in his view the credible evidence was sufficient to satisfy the elements of first-degree murder. Hallenbeck was sentenced to thirty years at the Adult Correctional Institutions (ACI), with twenty years to serve and ten years suspended and ten years probation. He later filed a motion to reduce sentence that the trial justice also denied.

On appeal, Hallenbeck sets forth six distinct challenges to the Superior Court proceedings. He contends that the trial justice committed error (1) by failing to instruct the jury properly on the issues of self-defense and manslaughter; (2) by denying his motion for judgment of acquittal; (3) by denying his motion for a new trial; (4) by denying his motion to have the victim's criminal record admitted; (5) by improperly admitting an enlarged photograph of the crime scene into evidence;

and (6) by improperly imposing sentence. For the reasons stated below, we affirm both the judgment of conviction and the sentence imposed.

## Statement of Facts

After shopping for work clothes at Macy's in the Warwick Mall on May 29, 2001, Hallenbeck went to the Ground Round restaurant in the mall around 7:15 p.m. and took a seat at the bar. Over the course of the next several hours, he ordered two twenty-ounce beers and one smaller glass of beer, which he did not finish, but no food. Throughout the evening, defendant engaged in friendly conversation with the bartender, Christine Douthit. At one point, he intervened when an intoxicated patron became upset after Ms. Douthit "had to shut him off"; the defendant told the besotted man to calm down and leave Ms. Douthit alone. On two other occasions Hallenbeck interjected himself into conversations involving another customer; once when the latter ordered a drink that Ms. Douthit did not know how to prepare, and again when she undercharged the customer on his bill.

According to Ms. Douthit, Hallenbeck never appeared to be under the influence, and indeed drank only water after about 11 p.m.; but as the night went on, he became noticeably quieter and less talkative. It was such a complete change that she became concerned and asked him whether he needed a ride home. Apparently, this comment gave defendant the mistaken impression that she might have an amorous interest in him.

At some point that evening, Glenn Petersen entered the Ground Round before working the 11 p.m. to 7 a.m. shift as a maintenance worker at the mall. He took a seat at the opposite end of the bar from

Hallenbeck, and ordered a martini. He soon was joined by a fellow maintenance worker, Peter Cervone, also working the third shift, and Cervone's girlfriend. The defendant was overheard to make a comment that likened Petersen to Ron Jeremy, a pornographic film star. Cervone also testified that defendant shouted at Petersen, who was five-foot-two or five-foot-three-inches tall and smoking a pipe, "look at the little boy with a pipe." Hallenbeck denied making the second statement.

At 11:45 p.m. and again at 11:50 p.m. Ms. Douthit announced last call at the bar. She said that subsequently all the patrons at the bar left, with the exception of defendant, whom she said appeared to be waiting around.

Jason Webb, the cook at the Ground Round, testified that shortly before closing, Ms. Douthit came into the kitchen, worried that defendant still had not left the bar and expressing her concern that she did not want to take defendant home. The manager then directed Webb to escort defendant out of the restaurant.

When Webb approached the bar, he saw defendant and Ms. Douthit inside the bar area near the flip-up counter. He said he overheard a conversation with Ms. Douthit telling defendant he had to leave the bar and that she did not intend to take him home. Ms. Douthit confirmed in her testimony that she tried to coax defendant to leave. After he paid his bill and got up, she turned away and started cleaning the bar. When she turned around again, she saw defendant standing in the open flip-up doorway to the bar. She walked over to him and they were face to face when defendant grabbed her arms. The five-foot-six-inch-tall bartender told him: "Please, don't touch me." The defendant, however, who is six feet tall and weighed 220 to 225 pounds at the time, pulled her close to him.

Nonetheless, Ms. Douthit managed to push him away, only to be grabbed again. After she pushed him away a second time, she, in tears, again told him to leave. The defendant asked her, "Are you sure that's what you want?" before finally leaving the bar.

The defendant confirmed this incident, but said that he only went to the flip-up counter to give Ms. Douthit his signed check. When he gave her his check, he said, he put his other arm on her arm and asked: "You know, are we going to go do something when you get off? You said before about giving me a ride home." He said the bartender made it clear to him that this was not what she had meant, then she pulled her arm away and backed up. When he realized he had misunderstood her, he said it made him feel like a "jerk," and he "basically tucked [his] tail between [his] legs and left."

The chain of events that occurred after Hallenbeck left the restaurant was the subject of significant disparity at trial. The defendant testified that he left the Ground Round the same way he had come in, through a set of doors with push bars leading into the food court of the mall. From there he attempted to exit through another set of doors with push bars into the parking lot where he had parked his car. According to his testimony, he tried all the doors but they all were locked. He then started to make his way back to the Ground Round doors, when he heard someone yelling at him. He said he saw two people, whom he recognized from the bar and identified at trial as Glenn Petersen and Peter Cervone, approach and tell him: "What are you doing in here? The mall's closed. You're not supposed to be in here. You've got to come with us." To this he replied: "Who the hell are you? Why do I have to go with you?" Petersen then informed him that he did not have

keys to the doors opening into the parking lot.

Three eyewitnesses testified about the ensuing events: Peter Cervone, Jason Webb, and Mark Hallenbeck. Cervone testified that he and Petersen were cleaning the floor under the tables in the food court near the Ground Round when he saw defendant leave the Ground Round and head toward the doors to the parking lot. The defendant was trying to open the doors to the parking lot, and started swearing when he was not successful. When Petersen and Cervone approached him, and Petersen told him "The mall doors are locked. The mall is closed[,]" defendant swore at them and walked toward them. Glenn Petersen who, according to Cervone, was smoking his pipe at this time, offered to show Hallenbeck out through a door in the egress corridor near Taco Bell, about 150 feet into the food court. Petersen then began to lead the way around a carousel and toward Taco Bell, followed by Hallenbeck and Cervone.

Cervone testified that he knew that Petersen carried a folding knife with him in a snapped holster on the right side of his belt, which he used for work-related purposes, such as scraping gum off the floor. He further said that, after they had proceeded for about one-third of the way toward the egress corridor, Hallenbeck, who was carrying a shopping bag, started kicking and punching Petersen, and threw him to the ground "like a rag doll." Cervone said that when Petersen got up again, Hallenbeck began to punch and kick him again. Nevertheless, Petersen continued his way toward the egress corridor. As they approached Taco Bell, defendant knocked him to the ground again. Cervone said that, at some point, he called 911 from his cellular phone and tried to intervene in the situation by stepping in front of Hallenbeck and Petersen. He testified that defendant then told him: "Do you want me to take both of you guys on?"

According to Cervone, Petersen continued to proceed in the direction of the egress corridor, while defendant continued to strike him. He knocked Petersen down four or five times more. Cervone emphasized that while defendant hit Petersen, the latter never reached for his knife in the sheath on his belt or attempted to strike back at Hallenbeck; instead, Petersen simply tried to protect himself by blocking defendant's punches. When they reached the entrance to the egress corridor, Petersen was knocked down again and did not get up. Petersen was face up, with his head on the tile floor against the wall. The defendant knelt down, pinning Petersen against the wall. Cervone then observed defendant punch Petersen in the face five or six times with a closed fist. Cervone further saw defendant put his hands down to Petersen's right side. At this moment, Jason Webb came running toward them and jumped on Hallenbeck's back in a bear hug. Cervone then saw defendant's hand come up, holding a knife. When he raised the knife, Cervone said, Webb grabbed his hand, but Hallenbeck proceeded to stab Petersen in the groin area. When defendant raised the knife again, Webb grabbed the hand holding the knife and told defendant to let go of it. Cervone said that Hallenbeck then said to Webb: "If you don't let me go, you're next." Jason Webb then pulled the knife by the handle out of defendant's hand and gave it to Cervone, who placed it on the Taco Bell counter. At this point, Webb ran back toward the Ground Round. Cervone followed and was approached by defendant, who told him to call the police.

Jason Webb, in his testimony, largely confirmed the scenario that Cervone recited. Webb was the cook at the Ground Round. He said that at closing time the

restaurant's manager told him to escort Hallenbeck out of the Ground Round. The defendant went into the mall and did not exit out into the parking lot. When Hallenbeck tried to re-enter the Ground Round, Webb signaled him that he could not come back in. He said that he observed how Petersen attempted to show defendant out and that defendant responded by swearing at him. He then saw Petersen and Hallenbeck walk away toward the Taco Bell, where the lights were still on. When they walked around the carousel, Webb left the Ground Round and went into the mall to follow them. He testified how defendant stopped and attempted to turn around and go back, while Petersen told him that the exit was nearby. Webb then saw Hallenbeck suddenly strike Petersen in the head with the back of his hand. Webb testified that Petersen, holding his pipe in his hand, never hit defendant back, but, instead, started pushing him toward the Taco Bell exit. Webb continued to follow them, and said that when they reached the egress corridor, Hallenbeck knocked Petersen hard to the ground. The defendant then got down on his knees and "start[ed] wailing on his face." Webb described how defendant, bent over on one knee, hit Petersen repeatedly with his right fist four or five times "like a conveyor belt," causing his head to bounce and hit the floor with each punch. At the same time, Webb said, he overheard defendant utter words such as "I'll show you," and "I'll * * * teach you." Webb further testified that he approached defendant from behind and put his arms under defendant's arms to pull him back and lift him off Petersen, whose face was bloody at this point. Although he was successful in lifting him off a little bit, he, while still on defendant's back, observed how Hallenbeck opened up Petersen's knife sheath, pulled out the knife, opened it and stabbed Petersen in the area of his leg and groin. The defendant, according to Webb, then withdrew the knife and Webb grabbed his wrist. When defendant then threatened to stab him, Webb grabbed the knife by its handle, was able to pull it out of defendant's hand, and threw it to the ground. In doing so, he said, the knife's blade cut Hallenbeck's hand, causing it to bleed. Webb then returned to the Ground Round, where he gave a statement to police a short while later.

Hallenbeck offered a completely different version in his own defense. According to defendant, Petersen was "pretty angry" and "reeked of alcohol," and identified himself to Hallenbeck as "security." The defendant said that he agreed to be led out of the mall by Petersen and Cervone. With Petersen in the lead, followed by Hallenbeck and Cervone, the trio made their way around the large carousel located close to the Ground Round's entrance and into the food court, away from the doors to the Ground Round and the parking lot. Hallenbeck further said that as they made their way deeper into the food court, Petersen kept looking back over his shoulder to see whether he was following him. When defendant expressed his concern that there was no exit ahead of them, Petersen walked back behind him next to Cervone, and the two said: "Look, buddy, we're bringing you back that way. It's right up there where we showed you, let's go." Hallenbeck said that when he asked, "[w]ell, where are we going?", Petersen pushed him in the back and on the shoulder and said, "[w]e're going that way," pointing toward several stores down the hall on the right-hand side. After walking a short distance, Hallenbeck said, he did not see anything in the direction they were going. He alleged that Petersen pushed him again. As they were passing several stores, he said, Petersen pushed him an-

other three or four times. When they had reached an egress corridor about 150 feet from the Ground Round, Hallenbeck said, he became tired of being pushed. He then said he told Petersen, "[l]ook, buddy, you're not pushing me anymore. I'm all done." The defendant said that the diminutive Petersen then walked up to him, grabbed him by his shirt, and physically tried to push him back into the egress corridor. Hallenbeck further said that, initially, he neither saw a door nor an exit sign at the end of the egress corridor, but that, as he looked back, he saw glass doors with "a huge brick wall" behind them. He further said that being pushed by Petersen almost caused him to lose his balance. When he regained it, he said, he put his foot back to stop being pushed and knocked away Petersen's hands, which were still on his shirt. After that, he testified, Petersen punched him in the mouth. As a response, defendant said, he hit Petersen once with his right hand in the mouth or chin, followed by another punch with his left. Hallenbeck said that Petersen fell backwards after the second punch and that he himself was grabbed from behind and likewise started to fall backwards. Hallenbeck then said that he was turned sideways, still in the entrance area of the egress corridor, and was able to either push off the unidentified person or persons holding him, or was released by him/them. When he immediately turned around to look at Petersen, he said, he saw Petersen's two hands with a knife pointing at him. The defendant went on to testify that once he looked up into Petersen's face, he saw Petersen's arm coming toward him. He said that he then moved sideways, swung his right hand around and grabbed the knife blade. He then grabbed Petersen's wrist and "put [his] body in-between [Petersen's] body and where the knife was." In this position he tried to throw Petersen over his hip, and success-

fully did so, on the second attempt. The defendant said that, as a result, both he and Petersen fell to the ground, and that he hit the side of his head "pretty hard." He said that he then lunged at the knife, which was lying in the hallway, while he tried to get up at the same time. While he did so, he said, Petersen came over. At the same time, defendant again felt a weight on his back "like someone had jumped onto me with their full weight, and I went flat down on my face." The defendant further testified that, at this point, he tried to keep the knife away from himself and everybody else, but felt he was being pulled in all directions. He said that someone was trying to pull at his arm, while he tried to pull his arm away. When, after two or three unsuccessful attempts, he felt that someone had a really good grip on him, he said, he ripped his arm away and then felt the knife stop. When he looked up to see where it had stopped, he said he saw that "it was in somebody's leg." Screaming something like "[o]h my God," he said, he ripped the knife back out and threw it behind him. He said he saw Glenn Petersen curled up on the floor, holding his leg. Coming out of the egress corridor, he saw Cervone holding a cellular phone and told him to call the police. Stunned, defendant said, he decided to just stand there and wait for the police to arrive.

A short time later, Hallenbeck was arrested by two officers of the Warwick Police Department who had received a radio call at approximately 12:43 a.m. and arrived within one minute. Officers Cox and Grant, two Warwick patrolmen, testified that when they arrived at the Warwick Mall, they parked in front of the Ground Round and entered the food court from the Ground Round. They were approached by two women and Peter Cervone, who informed them about the altercation and said

that the alleged aggressor still was in the area and was wearing an orange T-shirt. Officer Grant called an ambulance and the two police officers continued into the food court with Cox in the lead. When they approached Hallenbeck, who was standing twenty-five to thirty feet away, with his hands by his side and blood slowly dripping from his right hand, they drew their weapons and Officer Cox ordered him to get down on the floor. According to Officer Grant, defendant did not respond to the initial order, but stood there "glaring" at the police officers. He did comply, however, after they repeated their command, and then was handcuffed by Officer Grant. Officer Cox attended to Glenn Petersen, who was curled up on the floor in a fetal position on his right side, his face grayish-blue. Officer Cox testified that there was a lot of blood on Petersen and the surrounding floor and that Petersen moaned "[h]e stabbed me," and later "I'm going to die." Cervone told Officer Cox that Petersen had been stabbed in the groin area below the belt. Officer Cox exposed the area by cutting Petersen's pants open and saw a wound that was slowly leaking blood. After Officer Cox had started to apply pressure to the wound, the Emergency Medical Technicians arrived and Officer Cox stepped aside.

According to Officer Grant, who remained with defendant at the scene, defendant made several comments about the altercation, including "[w]hat the * * *? That guy started with me. He started the fight"; and "[t]hat guy was drunk; he attacked me with a knife for no reason. What are you taking me out for?" Also, defendant was very concerned about his shopping bag and keys, left at the scene, and insisted on having his lip photographed, alleging that Petersen had punched him. Officer Grant took Hallenbeck to Kent County Memorial Hospital, where, after initially refusing treatment,

he received four stitches to his hand. From there, he took Hallenbeck to the Warwick police headquarters where defendant was processed and his hand and lip were photographed.

After Officer Grant informed defendant that Petersen had been seriously injured in the altercation, he responded: "I didn't start it. I don't care if he's hurt. I don't care if he dies. He got what he deserves. * * * It's not my fault he can't fight." Later, when Officer Grant told defendant that Glenn Petersen had died, he said, defendant responded by saying "[y]ou're trying to tell me he died from being stabbed in the crotch?"

Glenn Petersen was pronounced dead at Rhode Island Hospital in Providence at 1:41 a.m. on May 30, 2001. The assistant medical examiner for the State of Rhode Island, Dr. Dorota Latuszynski, testified at trial that in her opinion Petersen died from bleeding as the result of injuries of the femoral artery and vein caused by a stab wound to the right groin. Doctor Latuszynski indicated that Petersen suffered two wounds to his groin and leg area that were inflicted with a single thrust of a weapon. She confirmed that the knife shown to her as a trial exhibit was capable of inflicting this type of injury. She explained that injuries to the vein and artery would cause substantial blood loss, and she added that the blood loss from an injury to this particular artery is more serious and rapid because the femoral artery, which is one of the large body arteries and brings blood from the heart to the leg, is a high-pressure vessel. She was unable to exactly quantify the blood loss, but testified that significant amounts of blood were found at the scene and on the victim's clothing.

In addition to this deadly wound and several small wounds that, in part, could have been caused by the medical treat-

ment the victim received, Dr. Latuszynski testified that she observed an incision wound on Petersen's left chin, a blunt-force injury to his left eyebrow, and contusions to his left cheek and the inside of his lip. More significant, however, were the scalpular injuries to the sides and back of Petersen's head, which could be consistent with striking a hard surface. The medical examination also revealed that at the time of his death, Petersen's blood showed an alcohol level of 0.091, indicating that at the time he was stabbed it would have been 0.1 or more, making Petersen legally intoxicated. In addition, marijuana metabolites were present in the victim's urine, but it was impossible to say when this marijuana use would have occurred.

Doctor Michael Baden testified as an expert in forensic pathology for the defense. He did not partake in the autopsy itself, but reviewed the autopsy findings, the autopsy report, medical records, police reports ·and photographs from the crime scene and autopsy, among other things, to prepare for his testimony. Doctor Baden generally agreed with the state's medical examiner about the cause of Glenn Petersen's death, blood loss as a result of being stabbed by a knife, but said that in his opinion the blood loss came from the femoral vein and not the femoral artery. According to him, the small perforation of the femoral artery would have sealed itself "like a tubeless tire." Doctor Baden also testified that Glenn Petersen's death was accelerated because of an enlarged heart, causing him to die more quickly from loss of blood than had he had a more normal-sized heart. According to Dr. Baden, the amount of blood loss he observed, as well as the color of the victim's internal organs, was consistent with this finding. The only other significant disagreement between Dr. Baden's testimony and that of Dr. Latuszynski concerned the injuries on the sides and back of the victim's head. In

Dr. Baden's opinion, the injuries on the victim's head were "much more consistent with a few punches to the face" and "not consistent with being kicked, and beaten, and punched and thrown around like a rag doll." Thus, he said, they were more consistent with defendant's version of the events. Doctor Baden acknowledged, however, that the bruises on Glenn Petersen's scalp indeed could have been caused by coming into contact with a hard surface, such as the mall floor. In addition, Dr. Baden testified that the wound on Glenn Petersen's lip was a laceration, not an incision, and could have been caused by a hard punch to the area.

With regard to the incision wound on defendant's hand, Dr. Baden testified that the multiple cuts indicated that the knife was moving while being grabbed, making it more consistent with defendant's testimony that he grabbed the knife during the altercation. On cross-examination, Dr. Baden acknowledged, however, that the wounds he observed on defendant's hand also could be consistent with the scenario described by Jason Webb, who said that he pulled the knife out of defendant's hand.

## Discussion

### I

### Jury Instructions

#### A. The Proceedings at Trial

The defendant's first challenge on appeal addresses the jury instructions that the trial justice gave. He argues that the "trial court's jury instruction was constitutionally improper in regard to the important issue of self-defense and the question of voluntary and involuntary manslaughter standards." Such error, he further posits, resulted in confusion among the jurors, which could have been avoided had the trial justice given the instructions that defendant proposed. In addition, defendant

argues that the trial justice failed to properly instruct the jury that the state had the burden to disprove the defense of accident beyond a reasonable doubt. In response, the state argues that defendant waived all his arguments with regard to the jury instructions, with one small exception concerning the definition of the terms wanton and reckless.

The trial justice first instructed the jury on murder in the first and second degree. He then gave the following instruction with regard to manslaughter:

"Also, the crime of manslaughter is to be considered, if you determine it appropriate, as a lesser included offense of murder. If, after having reviewed all the evidence, together with the reasonable inferences to be drawn therefrom, you are not satisfied beyond a reasonable doubt as to the existence of any malice and premeditation in the mind of the defendant, then you cannot find the defendant guilty of either first or second degree murder. It would be at this point of your deliberations that you should consider whether or not the defendant committed the lesser included offense of manslaughter. Manslaughter is the unlawful but unintentional killing of a human being without malice aforethought or premeditation. A person who wantonly or recklessly does an act which results in the death of another human being is guilty of manslaughter, even though he did not contemplate such a result. Nothing more is required than the intentional doing of an act which, by reason of its wanton or reckless character, exposes another person to injury and causes such injury or death."

The trial justice followed this with instructions on accident and self-defense, and then instructed the jury on how to properly use the verdict form. After the trial justice delivered these instructions, defendant's counsel interposed the following objection:

"Your Honor, first of all, as the Court knows, I submitted a couple of proposed jury instructions on self-defense and accident. To preserve the record to the extent you didn't give them the way I submitted them there is an objection. With respect to the charge that you did give, I have a couple of things. One is you indicated that the jury has to determine that the defendant is entitled to invoke the doctrine of self-defense, but there's no information given to the jury by what standard they need to find that. That's one question. And along with that you made the statement, 'If you find beyond a reasonable doubt that the defendant did not act in self-defense, then you must find him guilty.' The problem is guilty of what, because even if they find he didn't act in self-defense, that doesn't mean they found premeditation or malice, and that calls into question the whole idea of giving them the order in which they have to consider the offenses. In conjunction with the self-defense, it's almost as though they should consider the self-defense argument first before they even get to anything else. But that instruction doesn't give them a clear understanding of what they can find him guilty of if they don't find self-defense. And I had just one other thing, Judge. In a couple of places you gave them, I think it was in the course of the manslaughter and second degree murder instructions, wanton and reckless conduct, and you didn't define wanton and reckless, and I don't know if they know what it is. At least I didn't hear you define it. If I'm wrong, I apologize."

Subsequently, a jury of twelve was chosen and commenced deliberations. About forty minutes later, the jury returned to

the courtroom asking for "written instructions for definitions." The trial justice, at this point, informed the jury that there were no written instructions available to the jurors, but that they could request to have specific instructions read back to them from the record. In addition, the trial justice supplemented his instructions about self-defense by saying:

> "I just want to make it clear that if you find beyond a reasonable doubt that the State proved that the defendant did not act in self-defense, then you must still find that the state has proved beyond a reasonable doubt whether the defendant is guilty of murder one, or murder in the first degree I should say, or murder in the second degree, or manslaughter according to the instructions I gave you as to the essential elements of those offenses."

In response to the trial justice's question whether either party had any exceptions or objections, counsel for defendant replied: "No, I think your supplemental instruction was consistent with what we discussed in chambers, Your Honor."

After deliberating for another full day without any interruptions, the jury suspended its deliberations on a Friday afternoon for a three-day weekend. Before doing so, however, the jurors gave the trial justice a written note saying: "We respectfully request the stenographer read back the Judge's instructions on manslaughter, self-defense, and accidental death Tuesday morning." On that day, after the stenographer had read back the requested instructions, the jury continued deliberations. At this point, however, defendant's counsel objected to the trial justice's failure to give further instructions that counsel had requested that morning. In addition, defendant's counsel remarked that, in his opinion, the jury's request to have these instructions read back was a sign of their confusion, caused by the

> "inconsistency between the self-defense and accident instructions on the one hand, and the manslaughter instruction on the other hand, to the extent that the manslaughter instruction did not necessarily, clearly explain whether it was directed to involuntary or voluntary manslaughter. * * * And so to the extent that Your Honor did not provide the clarification as I requested it, the defendant's objection should be noted."

The trial justice remarked, however, that he could not discern any confusion from the jury's request, but that it was understandable in light of the long recess. He also noted that there had been no objection to the manslaughter instruction at the time it originally was given. Shortly thereafter, the jury returned a verdict finding defendant guilty of manslaughter.

### B. Standard of Review

Rule 30 of the Superior Court Rules of Criminal Procedure provides in part: "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." Recently, we have held that "[t]he requirement in Rule 30 that the objection to an instruction be made before the jury retires (and that it be made with clarity and specificity) is crucial because, once alerted to the perceived error in the instruction that has been given, the trial justice has an opportunity to cure the alleged deficiencies before the jury retires for deliberations." *State v. Crow*, 871 A.2d 930, 935 (R.I.2005) (citing *State v. Hanes*, 783 A.2d 920, 924 (R.I.2001)). If, however, the "defense did not renew its objection to the jury instructions following [a] supplemental charge, * * * it is our opinion that

defense counsel's objection to the original charge was sufficient to preserve the issue for review." *Hanes*, 783 A.2d at 924.

■ Moreover, it is well established that "[o]n review, we examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." *State v. Ibrahim*, 862 A.2d 787, 796 (R.I. 2004) (quoting *State v. Kittell*, 847 A.2d 845, 849 (R.I.2004)).

## C. Waiver of Objections

The defendant presses three specific claims of error on appeal with respect to the jury instructions: (1) "that the trial justice erred by failing to instruct the jury that the state had the burden of disproving accident, beyond a reasonable doubt"; (2) that the trial justice failed to distinguish between voluntary and involuntary manslaughter, thus causing confusion to the jurors; and (3) that the court failed to instruct on the definitions of "wanton" and "reckless."

■ The defendant's first two contentions easily may be dispatched in that he has failed to preserve them for appellate review. Consistent with Rule 30, "[a] failure to object to a jury instruction precludes review of the instruction on appeal." *Ibrahim*, 862 A.2d at 795 (quoting *State v. Pacheco*, 763 A.2d 971, 979 (R.I.2001)). Moreover, "[g]eneral objections to instructions, without specific grounds are not a sufficient basis for review by this Court." *Id.* (quoting *East Coast Collision & Restoration, Inc. v. Allyn*, 742 A.2d 273, 275 (R.I.1999)). At no point did defendant specifically object to the court's instructions on the ground that they did not sufficiently advise the jury that the state had the burden of disproving accident beyond a reasonable doubt. And he did not voice any objection to the manslaughter instruction until the third day of delibera-

tions, when the jurors requested to have the instructions on manslaughter, self-defense, and accident read back to them. To view such an objection as timely would circumvent the clear language of Rule 30 that says "[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict * * *." We recently reiterated the purpose of this rule, which is "to ensure that the trial justice is alerted to any deficiencies in the charge while there is still an opportunity for cure." *Crow*, 871 A.2d at 935 (quoting *Hanes*, 783 A.2d at 924). We conclude, therefore that both of these objections are waived.

■ Even if these asseverations had been preserved properly, however, they would not warrant a reversal of the conviction. The defendant argues that the trial justice's failure to instruct the jury that the state bears the burden of disproving accident beyond a reasonable doubt "may have caused the jury to believe that the defense bore the burden of proving accident." A review of the record, however, reveals that on at least three occasions during the trial—once before the opening of evidence and twice more during his instructions—the trial justice clearly stated the general proposition that the burden of proving defendant guilty and the burden of proving each and every element of the offense rests with the state and never shifts to the defendant during the course of the trial. More significantly, with respect to his instruction on the theory of accident, he instructed:

> "It is important to keep in mind that a defendant in a criminal case has no burden of proof. Accordingly, the defendant does not have to prove that Glenn Petersen died accidentally. Rather, it is the State's burden to persuade you be-

yond a reasonable doubt that Glenn Petersen's death was not an accident. In other words, if you believe that there is some evidence that Glenn Petersen may have died accidentally, the State must prove to you beyond a reasonable doubt that it was not an accident."

In light of this specific instruction, and viewing the court's charge to the jury in its entirety, we are convinced that a jury of ordinary intelligent lay people would understand that the defense did not bear the burden of proving accident.

The defendant's second claim of error with respect to the jury instructions is that the trial justice erred by failing to distinguish voluntary and involuntary manslaughter, which, he further alleges, confused the jury. The defendant's counsel argued at trial that the jurors' request to have certain instructions read back to them after they returned from a long weekend demonstrated that the jury was confused.

 As to the issue of jury confusion we have held in the past that: "When the jury indicates to the trial justice that it does not understand an element of the offense charged or some other matter of law central to the guilt or innocence of the accused, the justice is obligated to clarify the matter for the jury in a concrete and unambiguous manner." *State v. Gomes,* 590 A.2d 391, 394 (R.I.1991) (citing *Leonardo v. People,* 728 P.2d 1252, 1256 (Colo. 1986)). "If it [is] * * * apparent that the jury simply overlooked some portion of the original instruction or if the jurors' confusion could have been adequately addressed by directing their attention to the original instructions, then repetition of those instructions * * * suffice[s] and additional instruction [is] * * * unnecessary." *Id.* (citing ABA Standards for Criminal Justice, Standard 15–4.3(a)(i) (2d ed.1980)). In the present case, however, the trial

justice noted, and it is apparent from the record, that the jurors never indicated that they were confused. The jurors did not ask for a clarification of the trial justice's earlier instructions, but rather asked to have the same instructions read back to them when they returned after a three-day hiatus.

 "It is well established that '[t]he charge given by a trial justice need only "adequately cover [ ] the law."' " *State v. Lynch,* 854 A.2d 1022, 1044 (R.I. 2004) (quoting *State v. Hazard,* 797 A.2d 448, 469 (R.I.2002)). " 'On review, [this Court] examine[s] the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them * * *.' " *Id.* "[A] trial justice's refusal to grant a request for jury instruction is not reversible error if the requested charge is fairly covered in the general charge." *Id.* (quoting *State v. Price,* 706 A.2d 929, 934 (R.I. 1998)). "[W]e test the validity of an instruction not by reading the challenged portion in isolation from the rest of the charge; rather, we examine the challenged portion in the context of the entire charge and determine from that whether the charge as given confused and misled the jury." *State v. Harris,* 106 R.I. 643, 649–50, 262 A.2d 374, 377–78 (1970).

 Our review of the manslaughter instruction in the trial record finds that the trial justice followed the definition of the crime of manslaughter set forth by this Court. This Court has defined involuntary manslaughter "as an unintentional homicide without malice aforethought, committed either in performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence." *State v. Hockenhull,* 525 A.2d 926, 929 (R.I.1987) (citing *State v. Freeman,* 473 A.2d 1149 (R.I.1984); *State*

*v. Lillibridge,* 454 A.2d 237 (R.I.1982); *State v. Vargas,* 420 A.2d 809 (R.I.1980)). "Involuntary manslaughter resulting from criminal negligence is a lesser degree of homicide than an act that may constitute murder as the result of the wanton recklessness of the accused." *Id.* (citing *State v. Iovino,* 524 A.2d 556 (R.I.1987)). This conforms with the trial justice's instruction that "[m]anslaughter is the unlawful but unintentional killing of a human being without malice aforethought or premeditation. A person who wantonly and recklessly does an act which results in the death of another human being is guilty of manslaughter, even though he did not contemplate such a result. Nothing more is required than the intentional doing of an act which, by reason of its wanton or reckless character, exposes another person to injury and causes such injury or death." "It is well settled that jury members are presumed to follow the instructions given by a trial justice." *State v. Perry,* 770 A.2d 882, 885 (R.I.2001) (citing *State v. Clark,* 754 A.2d 73, 80 (R.I.2000)). In the circumstances of this case, we are satisfied that the trial justice properly instructed the jury on manslaughter.

Although defendant does not specify in his written submissions his reasons for asserting a constitutional infirmity with respect to the trial justice's instruction on self-defense, we note that any such exception was waived when counsel said that he had no objection to the supplemental instruction given by the trial justice.

### D. Failure to Define "Wanton" and "Reckless"

Under the standard for jury instructions annunciated above, we now reach the one objection to the jury instructions that was preserved for appellate review—the question whether defendant was prejudiced by the trial justice's failure to explicitly define the terms "wanton" and "reckless." The defendant argues on appeal that this oversight aggravated the jury's confusion. Because we already have determined that the jury did not demonstrate any signs of confusion, we consider this question independently.

 Faced with the identical question, the Tenth Circuit Court of Appeals found no error in the trial judge's failure to define "wanton" and "reckless" in a manslaughter instruction, but rather held that "[t]hese terms are commonplace" and left the jury with sufficient guidance. *United States v. Bryant,* 892 F.2d 1466, 1468 (10th Cir.1989). Likewise, this Court has held that the trial justice did not err when he failed to define the word "intercept" in a case involving the unauthorized interception, disclosure or use of wire, electronic, or oral communication. *State v. O'Brien,* 774 A.2d 89, 101–02 (R.I.2001). We are satisfied that the manslaughter instruction in its entirety adequately covered the law and that the terms "wanton" and "reckless" are of such common usage as to provide sufficient guidance to a jury of ordinary intelligent lay people in discharging its responsibility to render a verdict.

### II

### Motion for Judgment of Acquittal

 In his next argument on appeal, defendant contends that the trial justice erred in denying his motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure.[1] "In reviewing a claim of legal

---

1. In his brief, defendant treats the trial justice's denial of his motion for judgment of acquittal together with the denial of his motion for a new trial. We will, however, treat the two separately because "[c]learly, '[t]he standard applied to a motion for judgment of

sufficiency of the evidence in the context of a motion for a judgment of acquittal, this Court applies the same standard as that applied by the trial court, namely, '[we] must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" *State v. Higham*, 865 A.2d 1040, 1048 (R.I.2004) (quoting *State v. Otero*, 788 A.2d 469, 475 (R.I. 2002)). "In ruling on this motion, the trial justice 'must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw therefrom all reasonable inferences consistent with guilt.'" *State v. Werner*, 851 A.2d 1093, 1110 (R.I.2004) (quoting *State v. Brown*, 798 A.2d 942, 950 (R.I.2002)). "Viewing the evidence in this light, if the evidence could sustain a guilty verdict by the jury, the trial justice should deny the motion." *Id.* (quoting *State v. Clifton*, 777 A.2d 1272, 1276–77 (R.I.2001)).

 In the current case, the trial justice, in denying defendant's motion for judgment of acquittal, observed that the testimony presented by the state, namely that "the defendant reached down and pulled a knife out of Mr. Petersen's belt, the sheath on his belt, and then proceeded to stab him * * * would have justified a verdict on murder as charged in the Indictment." The trial justice further added that the motion for judgment of acquittal also had to be denied in light of the evidence presented on self-defense because "according to the testimony of Paul [*sic*] Cervone and also [Jason] Webb, if believed by the jury, the defendant was the aggressor" and not entitled to invoke the doctrine of self-defense. *See State v. DiChristofa-*

*ro*, 848 A.2d 1127, 1130 (R.I.2004) (stating that "one who is the aggressor is generally not entitled to rely on the defense of self-defense").

In applying the same standard as the trial justice to the facts presented at trial, we reach the conclusion that he correctly denied defendant's motion for judgment of acquittal. The testimony offered by Peter Cervone and Jason Webb, in particular their descriptions of how defendant was the initial aggressor, and how he reached for the knife that Glenn Petersen carried in a sheath on his belt and stabbed him with it, if reviewed in the light most favorable to the state and drawing from it all reasonable inferences consistent with guilt, was more than sufficient to substantiate the jury verdict. Therefore, the trial justice correctly denied defendant's motion for judgment of acquittal.

### III

### Motion for a New Trial

Next, defendant argues that the trial justice should have granted his motion for a new trial, which he timely filed pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. He supports this argument with four specific claims of error: (1) the trial justice was clearly wrong in rejecting defendant's theory of self-defense because the state had failed to prove that he was aware of an available avenue of retreat; (2) the trial justice made erroneous findings of fact concerning the defense case; (3) the trial justice mistook and overlooked material evidence; and (4) the trial justice improperly denied the motion for a new trial because in his role as a thirteenth juror, he "would have indeed 'hung' this jury and a new trial would have been

---

acquittal requires less in the way of evidence than the standard applicable to a motion for a new trial.'"' *State v. Higham*, 865 A.2d 1040,

1048 (R.I.2004) (quoting *State v. Otero*, 788 A.2d 469, 475 (R.I.2002)).

required by definition." The state argues, however, that the trial justice conducted a proper analysis in coming to an independent assessment of the evidence.

"In ruling on a motion for a new trial, 'the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" *Lynch,* 854 A.2d at 1046 (quoting *State v. Rieger,* 763 A.2d 997, 1001–02 (R.I.2001)). "The trial justice must consider the evidence in light of the charge to the jury, determining his or her own opinion of the evidence, weighing credibility and choosing among conflicting testimony, and must determine whether he or she would have reached a different result than that reached by the jury." *Id.* "Provided that the trial justice has 'articulated an adequate rationale for denying a motion,' a trial justice's ruling on a new trial motion is entitled to great weight." *Id.* (quoting *Rieger,* 763 A.2d at 1002). "A trial justice's ruling on a new-trial motion will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *Id.* (quoting *State v. Bolduc,* 822 A.2d 184, 187 (R.I.2003)).

In his ruling on the motion for a new trial, the trial justice reviewed the evidence presented at trial, and noted that despite some differences in opinion between the two medical experts, both agreed on the manner and cause of Glenn Petersen's death. He also noted that Dr. Baden, the medical expert for defendant, agreed that the injuries on both sides of the victim's head were consistent with trauma being inflicted. Further, the trial justice stated that defendant's testimony about the events that took place inside the Ground Round was largely consistent with that of other witnesses. He went on to remark that defendant and Peter Cervone both testified that Glenn Petersen attempted to show defendant out of the mall after he was unable to reach the parking lot, and that there was no dispute about the direction they were taking. The trial justice observed that from the point on where they approached the egress corridor, the other witnesses' testimony began to differ from that of defendant. The trial justice recalled the testimony of the three witnesses to the stabbing, defendant, Cervone, and Webb. He accepted certain aspects of Cervone's testimony and found the credibility of Webb's testimony to outweigh that of defendant's. The trial justice indicated that, in his opinion, the evidence at trial would have supported a harsher verdict than that returned by the jury, but he emphasized that the manslaughter verdict reached by the jury definitely was supported by the evidence in this case. This is consistent with the rule announced by this Court that "[i]f, after conducting [an] independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *State v. Gomez,* 848 A.2d 221, 234 (R.I. 2004) (quoting *Otero,* 788 A.2d at 472). Whether first-degree murder or manslaughter, however, the trial justice was convinced that the state had met its burden of proof in this case, thus requiring him to deny defendant's motion for a new trial. *See id.* (citing *Otero,* 788 A.2d at 472). Furthermore, the trial justice agreed with the jury's rejection of defendant's argument that Glenn Petersen's death was accidental and its refusal to accept the self-defense argument by finding defendant to be the aggressor and that defendant would have been aware of an avenue of escape.

We are satisfied that the trial justice considered the evidence adduced at trial in a comprehensive manner, weighed the credibility of the witnesses, and chose among conflicting testimony. The trial justice articulated a more than adequate rationale for denying defendant's motion for a new trial, and we cannot say that he was clearly wrong or overlooked or misconceived material and relevant evidence that related to a critical issue in the case. Therefore, the trial justice's denial of defendant's motion for a new trial must be upheld. We proceed, however, to address defendant's specifications of error in regard to the denial of his motion for a new trial.

### A. Avenue of Retreat

In essence, defendant asserts that the inescapable conclusion to be drawn from the evidence is that his slaying of Glenn Petersen that morning was inescapable. Once defendant raised the theory of self-defense, it became the state's burden to disprove it beyond a reasonable doubt. *See Infantolino v. State,* 414 A.2d 793, 796 (R.I.1980). He points to the testimony of Thomas Aversa, the head of maintenance of the Warwick Mall, as conclusively establishing the virtual impossibility of defendant's being aware of a safe and open avenue of retreat. According to defendant, Mr. Aversa's uncontradicted testimony was that there were two viable exits near the place where the stabbing occurred. The closest was a dimly lit egress corridor by Taco Bell, leading to a door operated from the inside by a thumb latch. The other was across the food court through a better-lit, but maze-like, corridor near the Burger King. The defendant contends that the state failed to prove that he consciously was aware of either exit.

In ruling on a motion for a new trial, a trial justice must consider the evidence in light of the charge to the jury. Here, the trial justice instructed that:

"The law [of self-defense] requires a person to retreat or attempt to retreat when he actually and reasonably believes that he is in danger of being attacked, as long as he is consciously aware of an open, safe, and available avenue of escape. If you find that the defendant could have retreated and did not attempt to do so, he is not entitled to use deadly force in his self-defense defense."

We are satisfied that in light of this charge the trial justice appropriately considered the evidence and determined that, in addition to the two egress corridors, the incident took place in a rather large mall. Because defendant had been shopping in the mall earlier that evening, the jury was clearly entitled to draw the inference that he was aware of an avenue of escape from his allegedly knife-wielding attacker. More significant, however, is the abundant evidence recounted by the trial justice demonstrating that defendant was the aggressor and, therefore, not entitled to invoke the defense of self-defense.

### B. Erroneous Findings of Fact

Next, defendant argues that the court made erroneous or improper findings of fact regarding the weight and credibility of the evidence. He asserts that the testimony of his expert witness, Dr. Baden, in conjunction with "the exculpatory and candid testimony of the defendant" is significant corroboration of defendant's version of events. The blunt force impact wounds to Mr. Petersen, the knife cuts to defendant's hands, the absence of any hematoma or contusions to the back of the victim's head and the latter's postmortem blood alcohol level, he contends, all support defendant's testimony.

We first observe that the trial justice carefully weighed the testimony of the three eyewitnesses and found Hallenbeck to be lacking in candor. Moreover, we are satisfied that the trial justice appropriately exercised his independent judgment and did not overlook evidence or make erroneous findings of fact.

### C. Photograph of Victim With Pipe in His Hand

The defendant next ascribes error to the trial justice's reliance on a photograph depicting Glenn Petersen with a pipe in his hand. In denying the motion for a new trial, the trial justice said:

> "And, that provides, really, the corroboration, if you would, for both Mr. Cervone's testimony and Mr. Webb's testimony that Mr. Hallenbeck was the aggressor because there's no way that Mr. Petersen with a pipe in his right hand would be able to form or throw a punch at Mr. Hallenbeck and then pull a knife and come after him with a knife again in his right hand. Frankly, * * * that photograph speaks volumes about what happened there at the scene of this stabbing on the early morning hours of May [30], 2001."

The defendant, however, cites "myriad examples of circumstantial evidence which clearly demonstrates that the victim could not have had a pipe in his hand at the time of the confrontation and subsequently thereto," thus leading to his conclusion that the trial justice mistook and overlooked material evidence. He argues that the weight of the testimony of the state's own witnesses make it impossible for the photographic evidence to be accurate. Specifically, the testimony that defendant threw Petersen to the ground "like a rag doll" and violently punched him and kicked him in the head, as the victim attempted to ward off the blows, belie the placement of the pipe in his right hand, as depicted in the photograph.

The admission of photographic evidence lies within the sound discretion of the trial justice. *See State v. Lora,* 850 A.2d 109, 111 (R.I.2004) (citing *State v. Houde,* 596 A.2d 330, 335 (R.I.1991)). Here, Officer Cox testified that the photograph in question fairly and accurately depicted the scene as he was attempting to assist Mr. Petersen. Moreover, Officer Cox further testified that when he first arrived, Petersen was curled up in a fetal position. He couldn't see the pipe as he lay in that position, "but when he rolled over on his back the pipe was in his hand." We conclude that the trial justice did not overlook or misconceive any material evidence.

### D. The Functionally "Hung" Jury

We perceive defendant's final claim of error with respect to the denial of his motion for a new trial to be as follows. By finding defendant not guilty of murder, the jury necessarily rejected the testimony of Cervone and Webb, and believed defendant "at least within the confines of the erroneous jury instructions." The trial justice, however, explicitly found Cervone and Webb to be more credible, and determined that this case was tantamount to a murder and not a manslaughter. Thus, there is "functionally and practically no agreement" between the trial justice, the thirteenth juror, and the other twelve jurors, such that the jury would have been "hung" and a new trial "required by definition."

We find this argument to be of no merit. Clearly, the trial justice believed that the evidence was sufficient to satisfy the elements of malice aforethought, premeditation and deliberation, and thus support a conviction of first-degree murder. But as he said, "my view of this case differs from

that of the jury but it's obviously one on which reasonable minds could differ and obviously the Court is not—cannot and will not second-guess the jury's verdict as to the counts of first and second degree murder, but certainly the evidence in this case, which this Court finds credible, is sufficient to satisfy the elements of first degree murder. Certainly it goes without saying it's necessary to satisfy the elements of second degree murder and also manslaughter and the Court and the jury found that." We agree.

## IV

### The Victim's Criminal Record

Before the trial began, defendant's counsel presented a motion *in limine* seeking to admit into evidence the victim's criminal record.[2] Conceding that the case law on this issue militates against admitting Glenn Petersen's criminal record into evidence, defendant nonetheless appeals this point and urges this Court to reconsider the established case law because, as defendant points out, evidence of the victim's criminal record was "extremely relevant" in this case and "may have proven that the victim was the aggressor in this confrontation." The defendant further argues that the criminal record was being offered to "refute, contradict and impeach the testimony of Webb and Cervone that it was the defendant that removed the victim's knife from the sheath and used it in the manner described." Such testimony would be inconsistent with their testimony that the victim never caused any trouble, and

therefore was related to defendant's right of confrontation and cross-examination. He submits that the trial justice should have admitted the evidence with an appropriate limiting instruction that it was being admitted solely on the issue of credibility of the state's witnesses. The trial justice said in his ruling that a record of criminal conviction or evidence of specific acts cannot be admitted "to prove either the reasonable fear element of self-defense, unless the defendant had knowledge of the victim's record, or the specific acts at the time of the alleged offense, which is being charged against the defendant, or that the victim acted in conformity with the prior acts of violence, so-called propensity testimony." He denied the motion, however, without prejudice because he acknowledged that depending on whether the victim's character for peacefulness was brought out through reputation and opinion testimony at trial, defendant may be able to use the victim's criminal record to impeach those witnesses.

"Justice Holmes observed in his treatise, 'precedents should be overruled when they become inconsistent with present conditions.'" *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 465 (R.I.1996) (quoting Oliver Wendell Holmes, Jr., *The Common Law* 126 (1881)). In the present case, however, we see no reason to disturb our line of case law on this issue that has been carefully crafted both before and after the Rhode Island Rules of Evidence were adopted in 1987. We therefore analyze

2. The victim's criminal record was not introduced into evidence at trial. In his motion *in limine,* seeking introduction of the record, defendant argues that the victim's criminal record goes back to 1976 and includes convictions for assault with intent to rape, conspiracy to escape, escape from the medical center, possession of PCP, possession of marijuana, malicious damage, disorderly conduct, as well as a second charge of assault with intent to rape, disorderly conduct, and attempted breaking and entering. In its objection to the motion *in limine,* the state argues, however, that Mr. Petersen had only two prior convictions, one for disorderly conduct dating from 1989 for which he was fined $100, and one for possession of marijuana, dating from 1985, for which he was fined $50.

defendant's argument according to existing precedent.

▇ "It is well settled that this Court will not disturb a trial justice's ruling on an evidentiary issue unless that ruling 'constitutes an abuse of the justice's discretion that prejudices the complaining party.'" *Gomez,* 848 A.2d at 232 (quoting *State v. Dellay,* 687 A.2d 435, 439 (R.I. 1996)).

Traditionally, this Court has held that evidence of specific bad acts is inadmissible at trial. *See, e.g., State v. Baker,* 417 A.2d 906, 911 (R.I.1980); *State v. Infantolino,* 116 R.I. 303, 314, 355 A.2d 722, 728 (1976). This rule is consistent with Rule 404(b) of the Rhode Island Rules of Evidence. Rule 404(b) provides:

> "*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

▇ In *State v. Tribble,* 428 A.2d 1079 (R.I.1981), however, this Court recognized an exception to the general prohibition against evidence of specific acts of violence when it held "that a defendant who asserts the defense of self-defense is now entitled to adduce relevant evidence of specific acts of violence perpetrated by the victim against third parties, provided however, that the defendant was aware of these acts at the time of his encounter with the victim." *Id.* at 1085.

"Under *Tribble,* however, a proper foundation must first be established before such evidence will be admitted to show the victim's previous violent tendencies, * * * and the defendant, to have that evidence admitted, must prove that he was aware of the events, that the events were not remote in time, and that the events were of such a quality as to be capable of contributing to the defendant's fear of the victim. * * * Whether that proper and required foundation has been laid is left to the sound discretion of the trial justice." *State v. Fillion,* 785 A.2d 536, 540 (R.I.2001) (citing *Tribble,* 428 A.2d at 1085–86).

The defendant admitted during his testimony that he never had seen Glenn Petersen before he took his seat at the bar in the Ground Round that fateful night. Thus, he could not be aware of any prior specific acts or acts of violence and could not meet his burden to show that he was aware of any specific bad acts that Petersen had committed.

In the current case, defendant sought to have Glenn Petersen's entire criminal record admitted into evidence. However, this Court remarked in *Tribble* that:

> "The defendant should not be authorized to introduce an entire criminal record which may include convictions for petty matters.
>
> "'Admission of an entire criminal record is, truly, an effort to disparage the victim's general character and is not probative of the defendant's apprehensive state of mind. We, therefore, are careful to note that while specific convictions for violent acts may be admissible, provided the defendant had knowledge of same, general proof of the victim's criminal disposition is not.'" *Tribble,* 428 A.2d at 1086 n. 11 (quoting *People v. Miller,* 39 N.Y.2d 543, 384 N.Y.S.2d 741, 349 N.E.2d 841, 848 (1976)).

▇ Moreover, to further his self-defense argument, it is not necessary that defendant show specific bad acts of the

victim to demonstrate that Glenn Petersen was the aggressor in this confrontation. "Rhode Island [law] does not require proof that the victim was the initial aggressor to sustain a defense of self-defense. 'Under the law relating to self-defense, one may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another. Such a person, having the fear, need not wait for the other to strike the first blow.'" *Dellay*, 687 A.2d at 438 (quoting *State v. D'Amario*, 568 A.2d 1383, 1385 (R.I.1990)). Therefore, defendant did not need to proffer evidence of specific instances of the victim's conduct or evidence of other crimes, wrongs, or acts to perfect his defense of self-defense.

Accordingly, we hold today that the trial justice acted according to existing precedent and did not abuse his discretion when he refused to admit the victim's criminal record into evidence in this case.

## V

### Admission of a Photograph of the Victim After the Stabbing

In his next point on appeal, defendant argues that the trial justice improperly admitted a photograph of the crime scene into evidence. The picture, which was admitted as a full exhibit, is a 20″x30″ black-and-white enlargement of a photograph. It shows the victim, with his head to the left of the picture, lying on the floor, arms spread to the sides, and holding a tobacco pipe in his right hand. The victim's head is on the tile floor, his eyes are closed, and his mouth is open. The rest of his body is lying on a rough industrial carpet, with his left leg stretched out and the right leg bent up at the knee. The victim's pants appear to have been opened to expose his abdomen, and his right pant leg was cut, exposing his right leg. The victim's leg and shirt are splattered with blood, and

there appears to be a significant amount of blood on the floor. Several items, appearing to be a T-shirt and paper towels, also show signs of blood. In the picture's foreground, approximately one-half an arm length away from the victim is a key chain on the floor. In the right third of the photograph, there is a uniformed police officer, wearing gloves and bent over at the knee, who appears to be attending to the victim.

Officer Cox testified that he was the police officer in the photograph, and described how he attempted to give first aid to Glenn Petersen until the ambulance arrived. Officer Cox said that the photograph fairly and accurately depicts the scene when he attempted to help Mr. Petersen.

The defendant objected twice at trial to the admission of this photograph. First, when the state attempted to show the photograph, marked for identification, to the testifying officer and asked him "[w]hat do you recognize it to be?[,]" defendant objected, saying: "First of all he already explained this to the jury. We haven't had a chance to say that's a fair and accurate representation of what it is." The trial justice noted the objection and overruled it. Second, when the state moved the photograph to be admitted as a full exhibit, defendant objected again. During a conference at sidebar, counsel said to support his objection that

"this picture does not fairly represent what [Officer Cox] saw when he first arrived and observed Mr. Petersen. One of the first things he said he saw was he was in the fetal position. You notice in the picture this individual is not in the fetal position. He claims the face is all bloody. You look at the face, there's no blood on the face. There are a number of other objections. I am

saying this picture does not fairly depict what he first saw, and that's what he testified to."

The state countered by saying that

"[t]he question posed to the witness was, [does] that fairly describe the scene you were in. He placed himself in that picture that was photographed by Det. D'Alfonso at the Warwick Police Department, and it occurred while he was attempting to treat Mr. Petersen, and he saw the * * * pipe in his hand, as he had an overall view of Mr. Petersen at the scene, and that that picture fairly depicted Mr. Petersen's appearance, including the pipe in his hand[ ] at that time."

Subsequently, the trial justice overruled the objection and admitted the photograph into evidence as a full exhibit.

■ On appeal, defendant argues that the photograph should have been excluded because it unduly prejudiced him and did not depict the victim "as he was specifically at the time of Officer Cox's scrutiny."[3] In addition, defendant alleges that the prejudice was heightened because the photograph constituted an enlargement and was shown to the jury on an easel throughout the testimony of Officers Cox and Grant, as well as during closing arguments.

The state counters that defendant's argument on appeal concerning the photograph is limited to his objection articulated at trial, *i.e.*, that it was not a fair representation of what Officer Cox saw when he first arrived at the scene. The state cites *State v. Neri*, 593 A.2d 953 (R.I.1991) to support its argument that all other

grounds for objection to the admission of the photograph were waived because when "the introduction of evidence is objected to for a specific reason, other grounds for objection are waived and may not be raised for the first time on appeal." *Id.* at 956. Thus, according to the state, defendant's argument that he was prejudiced by the admission of the photograph is waived on appeal. In the alternative the state argues that, even if the argument was preserved for appeal, the trial justice did not abuse his discretion when he admitted it into evidence as a full exhibit because the photograph was relevant and its probative value outweighed any prejudice and did not inflame the jurors beyond the ordinary prejudice associated with relevant evidence.

### A. Waiver of the Argument on Appeal

Rule 103 of the Rhode Island Rules of Evidence, entitled "Rulings on evidence," provides in pertinent part:

"(a) *Effect of Erroneous Ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

"(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context * * *."

■ When construing this provision, this Court often has said "that when, at trial, 'the introduction of evidence is objected to for a specific reason, other grounds for objection are waived and may

---

**3.** In addition, defendant, on appeal, challenges the accuracy of the photograph in conjunction with his argument on the motion for a new trial. The defendant, however, does not pursue this argument beyond a cursory accusatory statement. We see no reason to

further address this argument because it was raised for the first time on appeal and was thus waived. *See State v. Bettencourt*, 723 A.2d 1101, 1107–08 (R.I.1999); *State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994).

not be raised for the first time on appeal.'" *State v. Bettencourt,* 723 A.2d 1101, 1107 (R.I.1999) (quoting *Neri,* 593 A.2d at 956). "According to our well-settled 'raise or waive' rule, issues that were not preserved by a specific objection at trial, 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.' * * * Another basic rule of our appellate practice is that this court will not review objections that were not raised at trial. * * * 'Consequently, allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level.'" *Id.* at 1107–08 (quoting *State v. Toole,* 640 A.2d 965, 972–73 (R.I. 1994)).

■ In addition, "[i]t is well established that Rhode Island does not recognize the plain-error rule. 'Indeed, in promulgating rules of criminal procedure, Rule 52(b) of the Federal Rules of Criminal Procedure, which deals with plain error, was specifically deleted to conform to Rhode Island case law.'" *State v. Rupert,* 649 A.2d 1013, 1015–16 (R.I.1994) (quoting *State v. Williams,* 432 A.2d 667, 670 (R.I. 1981)). "An exception to Rhode Island's 'raise or waive' rule does exist. To qualify as an exception to the rule, the error complained of must be more than harmless error, the record must be sufficient to permit a determination of the issue, the issue must be of constitutional dimension, and counsel's failure to raise the issue must be attributed to a novel rule of law that counsel could not reasonably have known during trial." *Id.* at 1016 (citing *State v. Estrada,* 537 A.2d 983, 987 (R.I. 1988)).

■ In the present case, defendant objected to the admission of the photograph, challenging whether it was a fair and accurate representation of the crime scene when Officer Cox first arrived and observed the victim. We are unable to construe this as an objection asserting that the photograph was unduly prejudicial, challenging its size or its authenticity. Consequently, those challenges are waived because they were raised for the first time on appeal. Moreover, defense counsel's failure to properly object to the admission of the photograph is not governed by a novel rule of law because all claims, those preserved below as well as those raised for the first time on appeal, are based on long-established evidentiary rules.

## B. Foundation for Admission of the Photograph

■ With regard to defendant's argument that was preserved for appeal, it is well established that "[i]t is within the trial court's discretion to determine the materiality or relevance of photographs." *State v. Tassone,* 749 A.2d 1112, 1119 (R.I.2000) (quoting *Bettencourt,* 723 A.2d at 1108).

■ In our attempt to characterize the exact nature of defendant's objection to the photograph at trial, that it "does not fairly represent" or depict what Officer Cox first saw when he arrived at the scene, we conclude that an objection of this nature foremost challenges the foundation laid for the evidence. "For the admission of photographic evidence, we have always required that an adequate foundation be laid. We have consistently held that a proper foundation requires testimony that the photograph is a fair and accurate representation of facts personally observed by the witness." *State v. Manocchio,* 497 A.2d 1, 11 (R.I.1985) (citing *State v. Pulphus,* 465 A.2d 153 (R.I.1983)). "Whether or not a sufficiently strong foundation has been laid is left to the sound discretion of the trial justice and is reviewable only for an abuse of discretion." *Pulphus,* 465 A.2d at 161.

■ Here, we are satisfied that the trial justice did not abuse his discretion by determining that the state provided sufficient foundation for the admission of the photograph in question. In response to the state's questions Officer Cox identified the people depicted in the photograph as Glenn Petersen and himself, and said that he was in the process of trying to help Mr. Petersen. He further identified the person who took the picture as Sgt. D'Alfonso, "a supervisor in the Uniform Patrol Division, third shift, Warwick Police Department." The photograph was further described as "fairly and accurately depict[ing] the scene after [Officer Cox] cut the leg on Mr. Petersen's pants." At no point did Officer Cox say that the photograph depicted the victim as he saw him when he first arrived at the scene. Consequently, because of the lack of further specific objections to the photograph and because a proper foundation indeed was laid, we hold that the trial justice did not abuse his discretion in admitting the photograph into evidence, even though the trial justice did not voice any specific reasons for overruling defendant's objection.

■ Even if we construed defendant's objections to extend to the issue of relevancy and prejudice, we would reach a similar result. "[A] photograph is relevant if it has a tendency to 'prove or disprove some material fact in issue.'" *State v. Belloli,* 766 A.2d 928, 930 (R.I.2001) (quoting *State v. Spratt,* 742 A.2d 1194, 1198 (R.I.1999)). "In a prosecution for murder, photographs 'which are shown to be faithful representations of the victim at the time in question, are in the discretion of the trial court, admissible into evidence as an aid to the jury in arriving at a proper understanding of the evidence as proof of the corpus delicti, the extent of the injury, the condition and identification of the body[,] or for their bearing on the question

of the degree of atrociousness of the crime * * *.'" *Id.* (quoting *State v. Winston,* 105 R.I. 447, 450, 252 A.2d 354, 356 (1969)). If found relevant and challenged under Rule 403 of the Rhode Island Rules of Evidence, on appeal

"[o]ur function is to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered * * * might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent.'" *Belloli,* 766 A.2d at 930 (quoting *Spratt,* 742 A.2d at 1198).

"The test is whether the photograph is 'of such a nature as to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt.'" *Id.* (quoting *Spratt,* 742 A.2d at 1198).

■ After examining the transcripts and the photograph in question, we find that it correctly shows the victim at the time Officer Cox attempted to save his life and serves to aid the jury in arriving at an understanding of the gruesome situation created by this stabbing. In addition, we are satisfied that the relevancy of this photograph would outweigh any prejudice suffered by defendant and that, therefore, under this analysis as well, the trial justice did not abuse his discretion in overruling defendant's objection to the admission of the photograph.

## VI

### Motion to Reduce the Sentence

In his final argument on appeal, defendant challenges the length of his sentence that the trial justice imposed after the jury returned a verdict finding him guilty

of manslaughter. On January 15, 2003, the trial justice sentenced defendant to thirty years at the ACI, with twenty years to serve and ten years suspended with ten years of probation. A judgment of conviction and commitment was entered on January 29, 2003, and on May 6, 2003, defendant filed a timely motion to reduce sentence, pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure.

Rule 35(a) provides that: "The court may correct a sentence imposed in an illegal manner and it may reduce any sentence when a motion is filed within one hundred and twenty (120) days after the sentence is imposed * * *." When he filed his motion to reduce sentence on May 6, 2003, defendant was well within the time frame required by Rule 35. The trial justice heard the motion to reduce sentence and denied it on November 14, 2003. It does not appear from the record, however, that an order ever entered. Moreover, defendant did not file a notice of appeal concerning the denial of his Rule 35 motion to reduce sentence. He had, however, filed a notice of appeal in Superior Court immediately following his sentencing on January 15, 2003.

Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure provides in pertinent part: "In a criminal case the notice of appeal by a defendant shall be filed with the clerk of the Superior Court within twenty (20) days after the entry of judgment or order appealed from." In addition, Article I, Rule 3(c) of the Supreme Court Rules of Appellate Procedure says that "[t]he notice of appeal shall specify the party or parties taking the appeal and shall designate the judgment, order or decree or part thereof appealed from." A basic requirement of a valid appeal before this Court, therefore, is the filing of a notice of appeal with the clerk of the Superior Court, which is the "sole *sine qua non* of the taking of the appeal." Joseph R. Weisberger, Rhode Island Appellate Practice cmt. 3.3 at 14 (1993). "In order that an appeal be properly before this court, Rule 3(a) of the Supreme Court Rules of Appellate Procedure requires the timely filing of a notice of appeal. Rule 3(a) makes clear that failure to file a timely notice of appeal renders any purported appeal invalid[,]" *Martin v. Lilly*, 505 A.2d 1156, 1159 (R.I. 1986), because the rule provides that "[a]n appeal permitted by law from a trial court to the Supreme Court shall be taken by filing a notice of appeal in the trial court." Rule 3(a). The other underlying requirement to an appeal is a "judgment or order appealed from." Rule 4(b); *see also* Rule 3(c). To mitigate any flaws with respect to this second requirement, Rule 4(b) provides that "[a] notice of appeal filed after the announcement of a decision, sentence or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof." In addition, this Court routinely holds that: "An appeal filed before entry of a final judgment may be treated as timely in the interests of justice and to avoid undue hardship." *State v. Disla*, 874 A.2d 190, 192 n. 2 (R.I.2005) (citing *State v. Ibrahim*, 862 A.2d 787, 793 (R.I.2004)). No rule exists, however, in this jurisdiction that provides for the proper consideration of an issue on appeal for which a notice of appeal never was filed. In the present case, the notice of appeal filed on January 15, 2003, does not encompass the trial justice's denial of defendant's motion to reduce sentence, which was filed on May 6, 2003, and denied on November 14, 2003.

Consequently, the arguments that the defendant presented in his brief concerning the trial justice's denial of his motion to reduce sentence are not properly before

us and we decline to further address the issue.

## Conclusion

For the foregoing reasons, we affirm the judgment of conviction. The record in this case shall be remanded to the Superior Court.