### STATE

v.

### Wesley SPRATT.

No. 97–547–C.A.

Supreme Court of Rhode Island.

Dec. 21, 1999.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

# OPINION

LEDERBERG, Justice.

This case is before the Supreme Court on the appeal of Wesley Spratt (defendant) from judgments of conviction on counts of first-degree murder, carrying a pistol without a license, and committing a crime of violence when armed with a firearm. The defendant argued that the trial justice committed reversible error when he admitted into evidence a photograph of the murder victim wearing a tuxedo some months before he died. The defendant further argued that the trial justice also erred when he allowed a prosecution witness to identify the defendant at trial. For the following reasons, we disagree and affirm the convictions.

## Facts and Procedure

On December 20, 1995, Anthony Tortolani (Tortolani) was working the afternoon three-to-six o'clock shift as an attendant at a parking lot on Weybosset Street in Providence, Rhode Island. At about 5:15 p.m., two men in the rear of the parking lot caught his attention. He noticed that one of the men was wearing an unusual hat with a visor and long tassels, and he recog-nized him as defendant, a person with whom he had been acquainted for about a year and a half. The other individual, who remained about ten feet away and did not participate in the conversation between Tortolani and defendant, was later identified as Mark Warren (Warren).

Tortolani testified that on that cold and snowy evening, defendant was emotional as he told Tortolani that he needed money because he had been in an accident while driving someone else's car the previous night. The defendant admitted that he and Warren originally had planned to rob Tortolani but then decided against it because Tortolani was a friend. Nevertheless, defendant confided in Tortolani that he was definitely going to rob somebody that night, and pulled out a gun to prove his sincerity.[1] After defendant suggested that he and the parking attendant "fake" a robbery, Tortolani refused and attempted unsuccessfully to persuade defendant to abandon his plan. When defendant again asked Tortolani for money, he gave him a twenty-dollar bill, but defendant complained that it was not enough. The defendant then walked off angrily, with Warren following, in the direction of Snow Street. After defendant and Warren left, Tortolani briefly spoke with a customer and then called the police to report that two men, one of whom was armed, were about to commit a robbery.

Warren continued to follow defendant to a nearby parking lot on Snow Street. About thirty feet from the parking attendant booth, Warren stopped following him and watched defendant approach the booth, enter it, and close the door behind him. The booth's interior lights were turned off, and seconds later defendant ran out of the booth. Warren heard someone's moans and a cry for help from inside the booth. The defendant and Warren ran to the car that they had parked earlier

---

1. At trial, the state proffered evidence that the gun was registered to Warren's girlfriend, Ve-nus Naser.

that evening. When inside the car Warren asked defendant what had happened in the booth, to which defendant remarked, "Don't worry about it." When Warren questioned him about the man's screams that he had heard, defendant explained that "the guy scuffled" with him. The man whom Warren heard crying for help was Christopher Naylor (Naylor), a parking attendant at the Snow Street parking lot.

During these events, Raymond Perrin (Perrin) was cleaning the snow from his car parked in the Snow Street lot. When he heard someone shout, "This man's been shot!," he turned toward the voice and saw a man running away from the attendant's booth. Perrin saw the profile of the fleeing man's face from roughly fifteen feet away for a period he estimated to be between ten and fifteen seconds. He later described the man as dark-skinned, approximately five feet eight inches tall, wearing a puffy coat with pockets and a dark hat with fringes and a visor. He did not notice anyone following the man. After hearing someone shout something like, "Call an ambulance," Perrin ran to a nearby building and asked the guard there to call 911. A co-worker Paul Wise (Wise), who was working at the attendant's booth across the street from Naylor, also called 911. Paramedics arrived within a few minutes in response to the calls. In spite of the efforts of medical personnel to stop his internal bleeding, Naylor died seven hours after he was shot in the abdomen.

About ten o'clock that evening, patrol officer Brian MacKnight (MacKnight) and Sergeant Paul Brousseau apprehended and arrested defendant in response to a police radio broadcast that identified him as a possible suspect in a robbery and shooting in downtown Providence. In conducting a custodial search of defendant at the police station, MacKnight found a one-way bus ticket to Boston, purchased that night, and $92.11, but did not find a gun.

On March 1, 1996, a grand jury indicted Spratt on five counts: murder, robbery in the first degree, larceny of a firearm, carrying a pistol without a license, and commission of a crime of violence when armed with a stolen firearm. After trial in Superior Court, the jury returned a verdict of guilty of murdering Naylor while committing or attempting to commit robbery, guilty of first-degree robbery, guilty of carrying a pistol without a license, and guilty of committing a crime of violence while armed with a firearm. The jury found defendant not guilty of larceny of a firearm and also found that he did not commit robbery with a gun that he knew to be stolen. The jury further found that defendant did not intentionally kill Naylor.

The trial justice declined to sentence defendant on the robbery charge because it was the underlying basis of the felony murder conviction.[2] The defendant was sentenced as follows: for the murder of Naylor, life in prison; for carrying a pistol without a license and for committing robbery while armed with a firearm, ten years each, both consecutive to each other and to the life sentence; and for being a habitual offender, a twenty-year sentence consecutive to those, all to be served without parole.

### Admission of the Photograph

■ On appeal, defendant argued that the trial justice committed reversible error when he admitted into evidence a photograph of Naylor taken when he was alive. Specifically, he claimed that the photograph was not relevant. He further contended that, under Rule 403 of the Rhode Island Rules of Evidence, any probative value of the photograph was substantially outweighed by the danger of unfair prejudice.

While Wise was on the stand, the prosecutor asked him to identify the individual pictured in a photograph. Wise identified

2. The trial justice also declined to dismiss the robbery count, thereby protecting the state's

interest, in the event that this Court were to remand the case for a new trial for example.

Naylor, who was wearing a tuxedo and standing in what appeared to be the aisle of a church or temple. Over defendant's objection, the trial justice admitted the photograph as a full exhibit. Shortly thereafter, out of the presence of the jury, the trial justice allowed the defendant an opportunity to voice his reasons for objecting. After hearing defendant's arguments, the trial justice concluded that he was satisfied that the photograph should be admitted, noting that "to the extent that [defendant is] concerned about unfair prejudice, I would expect there is none at all." The trial justice qualified this statement by assuring the defendant that he would instruct the jurors that sympathy and compassion are not matters that they can take into account in rendering their verdict. At the close of trial, the trial justice instructed the jurors that they could not permit prejudice, sympathy or compassion to influence their decision.

As with the admission of evidence generally, determining the relevance of photographs is within the sound discretion of the trial justice. *State v. Bettencourt,* 723 A.2d 1101, 1108 (R.I.1999). We have explained that "[a] photograph is relevant if it has a tendency to 'prove or disprove some material fact in issue.'" *State v. Rivera,* 640 A.2d 524, 526 (R.I. 1994) (quoting *State v. Correia,* 600 A.2d 279, 285 (R.I.1991)). Applying these principles, we conclude that the photograph at issue was relevant. "When the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable doubt, even if some of those elements may not be disputed. Because of this burden, the state has the right to establish the existence of those elements as it deems just." *State v. Mora,* 618 A.2d 1275, 1280 (R.I.1993). Here, the photograph was relevant to the victim's identity, an element that the prosecutor is burdened with proving to support the charge of murder.

The defendant further argued that the photograph, even if relevant, should

have been excluded under Rule 403 because it was "likely to arouse the passions of the jurors." He emphasized that the photograph portrayed Naylor in a tuxedo, quite possibly at his own wedding, contending that the "heart-wrenching" depiction would have evoked an emotional response resulting in the jurors' abandoning their impartiality in favor of sympathy for the victim.

Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." On appeal, "[o]ur function is to review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered * * * might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent.'" *State v. Griffin,* 567 A.2d 796, 801 (R.I.1989) (quoting *State v. Ware,* 524 A.2d 1110, 1113 (R.I.1987)). "The test is whether the photograph is 'of such a nature as to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt.'" *State v. Beauchamp,* 671 A.2d 1238, 1241 (R.I.1996) (quoting *State v. Fenner,* 503 A.2d 518, 526 (R.I.1986)).

We are unpersuaded by defendant's arguments of unfair prejudice. The defendant attempted to distinguish the "in-life photograph" here from the one admitted in *State v. Bertram,* 591 A.2d 14, 23 (R.I. 1991). There, we applied the Rule 403 balancing test and affirmed the trial court's admission of a photograph depicting the murder victim as a young, sixteen-year-old girl and the court's concurrent admission of a photograph of her body in a decomposed state. *Id.* at 22–23. Consid-

ering our ruling in *Bertram* and the graphic "before and after" nature of the photographs in that case, it is clear that the photograph here did not pose a danger of unfair prejudice.

The mere fact that the photograph possibly pictured him on his wedding day does not convince us that its admission was error. The jury heard evidence that Naylor was married. Any possible photographic proof of the fact would hardly inflame the jurors' passions. The photograph did not portray Naylor smiling or in the arms of another. Even if the photograph did portray Naylor at his wedding, it is our opinion that such a portrayal would not threaten the jury's ability to render a fair and impartial verdict. In light of the photograph's relevance to the victim's identity, it is our opinion that it was more probative than prejudicial.

### Witness Identification

■ The defendant next argued that the trial justice should not have admitted Perrin's in-court identification of Spratt. He contended that Perrin did not have "sufficient opportunity" to view defendant as he ran by, thereby rendering the identification unreliable under Rule 602 of the Rhode Island Rules of Evidence. Rule 602 provides in part that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself or herself."

■ In passing upon a Rule 602 motion, "the trial justice must determine whether a witness had a sufficient opportunity to perceive the subject matter about which he is testifying." *State v. Ranieri,* 586 A.2d 1094, 1098 (R.I.1991). "A Rule 602 personal-knowledge determination is a judgment call for the trial court that is best made with the aid of firsthand observation of the witness." *State v. Nhek,* 687 A.2d 81, 82–83 (R.I.1997). In so doing, the trial justice does not pass judgment upon the witness's credibility or the accuracy of his testimony. *Ranieri,* 586 A.2d at 1098 (citing 3 J. Weinstein & M. Bergen, *Weinstein's Evidence* ¶ 602[02] at 602–10, 602–11 (M.B.1988)). If a jury could find that the witness has personal knowledge of the facts testified to, the trial justice should admit the evidence, properly leaving the question of the witness's credibility to the jury. *Id.* Rule 602 works to exclude evidence only if the court finds that the witness could not actually have observed the subject matter of his or her testimony. *Id.* On review, we shall not disturb the trial court's Rule 602 determination unless it is clear that the court has abused its broad discretion. *State v. McDowell,* 685 A.2d 252, 255 (R.I.1996); *Ranieri,* 586 A.2d at 1098–99.

Applying this standard, we conclude that the trial justice did not err in determining that the state proffered evidence sufficient to support a finding that Perrin had actual knowledge of the subject of his testimony. In opposing the testimony, defendant relied upon *Ranieri,* 586 A.2d at 1099, in which we held that a witness was not competent to testify under Rule 602. We reasoned that the witness in *Ranieri* admitted that she had never seen her attacker, who grabbed her from behind in her dark apartment moments after she awoke at 4 a.m. *Id.* Furthermore, the witness maintained for eighteen months that she saw nothing until, on the eve of trial, she told a different story, testifying that she knew her assailant was Ranieri because he was always watching her. *Id.* During that time, the *Providence Journal* reproduced several photographs of Ranieri on its pages. *Id.* These facts, combined with evidence that the witness had a "history of making unwarranted and unfair allegations against the defendant," supported our ruling that the trial justice was clearly erroneous in allowing the witness to testify as to her attacker's identity. *Id.* at 1099–1100.

Unlike the witness in *Ranieri*, Perrin actually saw defendant's face, in profile, from about fifteen feet away and for a time he estimated to be ten to fifteen seconds. The duration of his observation and the distance from which he made this observation made Perrin a competent witness to testify. Other facts support this conclusion, as well. Also, unlike the witness in *Ranieri*, Perrin consistently recalled perceiving a man running away from the attendant's booth that night. He provided the police with a detailed description of the man he saw, which matched the defendant's description in significant respects. Moreover, Wise testified that the Snow Street lot was illuminated by floodlights, and Perrin testified that the lighting in the parking lot was "not bright" but "wasn't that bad." Thus, we agree with the trial justice's finding that Perrin's testimony did not have the problems depicted in *Ranieri* and his conclusion that Perrin was "fully competent to testify."

In summary, therefore, we deny and dismiss the appeal and affirm the judgment of the Superior Court, to which we return the papers in the case.