STATE

v.

Antonio BRYANT.

No. 2004–163–C.A.

Supreme Court of Rhode Island.

Jan. 10, 2006.

Diane Daigle, for Petitioner.

Marie Roebuck, Providence, for Respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

After a jury trial in Superior Court, the defendant, Antonio Bryant, was convicted of simple domestic assault—his third conviction of a domestic offense. As a result of this conviction, the defendant was sentenced to a term of seven years—eighteen months to be served at the Adult Correctional Institutions and five and a half years suspended, with probation.

On appeal, defendant contends (1) that the trial justice erred in refusing to allow defense counsel the opportunity to make an opening statement prior to the intro-

duction of evidence by the state; (2) that the trial justice abused his discretion in refusing to strike the testimony of a young witness, Meraly R., for lack of personal knowledge on her part; and (3) that his constitutional right to due process was violated when the trial justice refused to declare a mistrial after the state attempted to elicit certain testimony from Officer Nichole Leboeuf.

This case came before the Supreme Court for oral argument on December 5, 2005, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and reviewing the memoranda submitted by the parties, we are of the opinion that cause has not been shown and that this case should be decided without further briefing or argument.

## Facts and Travel

On April 4, 2003, at approximately 9 p.m., the Central Falls police were asked to respond to an "unknown problem" at a multi-tenant residence at 239 Cowden Street in that city. Lissette Cuadras, the alleged victim in this case, lived on the second floor of that residence with defendant[1] and her four children, Cheyene, Thomas, Lynese, and Ebony.[2] Officer Nichole Leboeuf, a police officer and domestic violence instructor in the Central Falls Police Department, testified that when she arrived at the residence on the night in question she was directed to the second floor by Ms. Cuadras's frantic mother[3]

---

1. Ms. Cuadras testified that defendant lived in the apartment "on and off"—which we understand to mean that there were some occasions when he was at the residence and some when he was not. Ms. Cuadras further testified that, at the time of the incident in question, defendant had not been at the apartment for a couple of days.

2. Ebony is the daughter of Ms. Cuadras and defendant.

3. Evelyn Santiago, Ms. Cuadras's mother, lived on the third floor of the apartment building.

and a group of crying children who were standing in the main doorway of the apartment building. Officer Leboeuf testified that, when she went up to the second-floor apartment, she encountered Ms. Cuadras and defendant and a different group of children, who also were crying. According to the testimony of Officer Leboeuf, Ms. Cuadras was angrily demanding that defendant leave the house because he had been drinking and because they had been arguing. Officer Leboeuf testified that Ms. Cuadras and defendant were yelling loudly at each other and that she asked the children's grandmother to take the children upstairs.

When Sgt. Rene Ogni, Officer Leboeuf's supervisor and a domestic violence instructor in the Central Falls Police Department, arrived at the scene, he went up to the third floor to speak with the children while Officer Leboeuf remained on the second floor with Ms. Cuadras and defendant. Officer Leboeuf testified that, although Ms. Cuadras seemed upset, she refused to tell the police anything with respect to physical contact between herself and defendant. Nevertheless, based upon the information that was gathered by Sgt. Ogni during his conversations with the children on the third floor, defendant was placed under arrest.

On this particular day, Meraly R., Ms. Cuadras's thirteen-year-old niece, and Meraly's sister Lillian were spending the night at Ms. Cuadras's home. Meraly testified that, at some point that night, defendant telephoned Ms. Cuadras, who looked angry and upset during the conversation. Meraly further testified that, a few hours later, around 9 or 9:30 p.m., they heard someone banging on the main door of the apartment building, but her aunt told her to ignore the banging. At this time, Meraly testified, she was in her aunt's bedroom with her aunt, her cousins Thomas and

Cheyene, and her sister. According to the testimony of Meraly, defendant then climbed up the fire escape and entered the bedroom through one of the windows. Meraly testified that, as defendant was opening the bedroom window, Ms. Cuadras told Lillian to go upstairs and call the police, at which point Lillian ran out of the room and upstairs to her grandmother's apartment.

Meraly testified that, upon entering the bedroom, defendant grabbed Cheyene by her hair and put her into her own bedroom. Meraly further testified that, as defendant was grabbing Cheyene, her aunt approached defendant, who pushed her to the floor. According to Meraly's testimony, her aunt and defendant then moved into the kitchen, where defendant pushed Ms. Cuadras into the refrigerator several times, causing her to sustain bruises. Meraly further testified that defendant took Ms. Cuadras's glasses off and threw them into a pot. Meraly said that defendant then pushed Ms. Cuadras into the master bedroom and onto the bed, getting his hand tangled in her hair. According to Meraly's testimony, at some point during this argument, defendant told Ms. Cuadras that if she told the police what had happened she would be in big trouble.

During cross-examination by defendant's attorney, Meraly admitted that the testimony that she had given was half based on what she had observed on the night in question and half based on what she had heard the other children tell Sgt. Ogni when he questioned them that night. Meraly stated that when Sgt. Ogni interviewed the children they were all together and were listening to each other's conversations with the officer. However, on redirect examination, Meraly testified specifically as to what she remembered seeing on the night of the alleged incident:

"I saw him come in, and then I saw him take my cousin, then I saw him pushing my aunt a little bit; and when they were in the room, all I saw was like him pushing her on the bed and that's it."

At the conclusion of Meraly's testimony, defense counsel moved to strike her testimony in its entirety for lack of personal knowledge. The trial justice denied the motion to strike, stating that "[t]he jury is sophisticated enough to separate what she saw and didn't see based on the testimony that you both have elicited."

Cheyene B., Ms. Cuadras's ten-year-old daughter, and Thomas B., her eight-year-old son, both gave testimony that was similar to Meraly's testimony. Cheyene testified that when defendant entered the house on the night in question he pulled her hair and then pushed her and her mother. Likewise, Thomas testified that he saw defendant grab Cheyene by the hair and then push Cheyene and his mother. Thomas further testified that he saw defendant push his mother against the refrigerator. Cheyene and Thomas also both testified that the children were all together when they spoke with Sgt. Ogni in their grandmother's apartment.

Ms. Cuadras testified that, on the night in question, she was "pissed off" at defendant because he had not been home in two days, and when defendant entered her bedroom through the window,[4] she yelled at him, called him names and "went nuts." Ms. Cuadras testified that she told Lillian to go upstairs and get her mother because her mother was a mediator, and she did not want the incident to escalate into a big argument between defendant and her. Ms. Cuadras further testified that, when the police arrived at her apartment that night, she told them that she was sick of defendant and wanted him out of her house. It should be noted, however, that, although Ms. Cuadras testified that she and defendant were arguing, she also testified that he never shoved her, pulled her hair or hit any of her children. In fact, Ms. Cuadras continued to deny that defendant had assaulted her—even though, according to her testimony, one of the police officers who came to her apartment told her that if she did not tell them that defendant hit her they would take her children away from her.

Sergeant Ogni testified that, when he interviewed Cheyene, Thomas, and Meraly on the night of the alleged assault, they told him that defendant had come in through the window and had then hit, pushed, and grabbed Ms. Cuadras by the hair. Sergeant Ogni testified that Thomas also told him that defendant had threatened his mother by saying: "If the police come and you tell them that I hit you, when I get out of jail, it will be even worse for you." Sergeant Ogni further testified that, after speaking with the children, he told Officer Leboeuf to place defendant under arrest for domestic assault.

According to Sgt. Ogni's testimony, he then spoke to Ms. Cuadras about what the children had told him, and she asserted that what the children had described to him did not actually happen. On the other hand, Sgt. Ogni testified that Ms. Cuadras also told him that "[m]y children do not lie." Sergeant Ogni further testified that Ms. Cuadras refused to give the police a statement, sign any paperwork, or tell them that defendant had assaulted her.

---

**4.** According to Ms. Cuadras's testimony, it was not uncommon for defendant to enter the apartment through the window. Moreover, Ms. Cuadras testified that on the night of the alleged incident she had left her bedroom window open so that defendant could come in.

The defendant, who had two previous domestic offense convictions, was charged with simple domestic assault in violation of G.L.1956 § 11–5–3 and G.L.1956 § 12–29–5.[5] After a jury trial in Superior Court, defendant was found guilty of committing simple domestic assault upon Lissette Cuadras. Arguments were then heard on defendant's motion for a new trial, which the trial justice denied. As a result of this third domestic offense conviction, defendant was sentenced to a term of seven years—eighteen months to be served at the Adult Correctional Institutions and five and a half years suspended, with probation.

On appeal to this Court, defendant contends (1) that the trial justice committed error in refusing to allow defense counsel the opportunity to make an opening statement before the state introduced evidence; (2) that it was an abuse of discretion for the trial justice to refuse to strike the testimony of Meraly R. pursuant to Rule 602 of the Rhode Island Rules of Evidence for lack of personal knowledge; and (3) that it was a violation of his constitutional right to due process for the trial justice to refuse to declare a mistrial after the state attempted to elicit certain testimony from Officer Nichole Leboeuf.

## Standard of Review

■ The question of whether or not defense counsel was entitled to make an opening statement prior to the introduction of evidence by the state is a question of law, and thus is reviewable *de novo* by this Court. *See Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I. 2001) ("Questions of law and statutory interpretation * * * are reviewed *de novo* by this Court.").

■ By contrast, the determination of whether or not to strike the testimony of a witness pursuant to Rule 602 for lack of personal knowledge is left to the sound discretion of the trial justice and will only be overturned if there was a clear abuse of discretion. *See State v. Momplaisir,* 815 A.2d 65, 72 (R.I.2003) ("The admissibility of evidence is a question addressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a clear abuse of that discretion."); *State v. Spratt,* 742 A.2d 1194, 1199 (R.I.1999) ("On review, we shall not disturb the trial court's Rule 602 determination unless it is clear that the court has abused its broad discretion."). In *State v. Nhek,* 687 A.2d 81, 82–83 (R.I.1997), we noted that "[a] Rule 602 personal-knowledge determination is a judgment call for the trial court that is best made with the aid of firsthand observation of the witness."

■ Similarly, the decision of whether or not to pass a case and declare a mistrial

---

**5.** General Laws 1956 § 11–5–3(a), entitled "Simple assault or battery," provides: "Except as otherwise provided in § 11–5–2, every person who shall make an assault or battery or both shall be imprisoned not exceeding one year or fined not exceeding one thousand dollars ($1,000), or both." Section 11–5–3(b) also provides, however, that "[w]here the provisions of 'The Domestic Violence Prevention Act', chapter 29 of title 12, are applicable, the penalties for violation of this section shall also include the penalties as provided in § 12–29–5."

General Laws 1956 § 12–29–5(c), entitled "Disposition of domestic violence cases," provides, in pertinent part:

"(1) Every person convicted of an offense punishable as a misdemeanor involving domestic violence as defined in § 12–29–2 shall:

(i) For a second violation be imprisoned for a term of not less than ten (10) days and not more than one year.

(ii) For a third and subsequent violation be deemed guilty of a felony and be imprisoned for a term of not less than one year and not more than ten (10) years."

is also a matter left to the sound discretion of the trial justice, and that decision will not be disturbed on appeal absent clear error. *State v. Suero,* 721 A.2d 426, 429 (R.I.1998); *see also State v. Figueroa,* 673 A.2d 1084, 1091 (R.I.1996) ("[T]he determination of the trial justice concerning a ruling on a motion to pass a case and to declare a mistrial will be given great weight, and we will not disturb that determination unless it is clearly wrong."). We have observed that "[t]he rationale behind investing the trial justice with such extensive powers is that he or she possesses 'a "front row seat" at the trial and can best determine the effect of the improvident remarks upon the jury.'" *State v. Tempest,* 651 A.2d 1198, 1207 (R.I.1995).

## Analysis

### I

### The Opening Statement

■ The defendant's first argument on appeal is that the trial justice erred in refusing to allow his attorney the opportunity to make an opening statement prior to the introduction of evidence by the state. Because we conclude that defendant did not definitively state that he would be presenting any evidence or specify what affirmative evidence he reasonably expected to solicit on cross-examination of the state's witnesses, we reject this argument.

Rule 26.2 of the Superior Court Rules of Criminal Procedure permits a defendant to make an opening statement either just prior to the introduction of evidence by the state or just prior to presenting his or her case. In interpreting this rule, this Court has limited the scope of what defense counsel may appropriately include in an opening statement. In *State v. Byrnes,* 433 A.2d 658, 664 (R.I.1981), we spoke as follows about the role of an opening statement:

"The proper function of an opening statement is to apprise the jury with reasonable succinctness what the issues are in the case that is about to be heard and what evidence the prosecution and the defense expect to produce at trial in support of their respective positions."

In *State v. DePina,* 810 A.2d 768, 774 (R.I.2002), we further elaborated on the proper scope of opening statements. In that case, we noted that "opening statements are limited to discussing evidence that counsel hopes to introduce through witnesses." *Id.*

Although this Court has held that a defense attorney's opening statement may properly discuss affirmative evidence that he or she reasonably expects to solicit on cross-examination of a witness, we have also made clear that defense counsel must first bring this evidence to the attention of the trial justice.[6] *Id.* In *State v. Turner,*

---

6. We agree with the trial justice's ruling that defendant was not entitled to make an opening statement before the state introduced evidence in this case, but we disagree with the reasoning that he applied. It appears that the trial justice accepted the state's contention that defendant could use his opening statement only to identify the evidence that he was planning to present during his case in chief—not evidence that he expected to elicit on cross-examination of the state's witnesses. The trial justice stated that:

"[O]pening statement is for purposes of advising this jury as to what evidence the

particular party expects to show to this jury. It does not contain cross-examination as [defense counsel] asserts. * * * It is an opening statement of what her evidence expects to show.

"As far as the opening statement is concerned, the defense is not allowed to make one unless the defense is going to put on an affirmative defense. * * * This is not an appropriate case for opening statement if the defendant intends to put on no evidence. If the defendant wishes to take the stand himself, which is his right, or wishes to offer evidence of any kind through any

746 A.2d 700, 704 (R.I.2000), we held that it was not error for the trial justice to deny defense counsel the opportunity to make an opening statement prior to the introduction of evidence by the state where the defendant's attorney failed to state definitively whether or not he would be presenting evidence and failed to specify the information that he hoped to elicit on cross-examination. In that case, when defense counsel sought to make an opening statement immediately after the state's opening statement, he had not yet decided whether or not defendant would testify—and, furthermore, he refused to divulge what new evidence he hoped to elicit through cross-examination of the state's witnesses. *Id.*

Just as did the defendant in *Turner,* the defendant in the present case argues that he was entitled to make an opening statement prior to the introduction of evidence by the state, even though, at that point, defense counsel could not definitively state whether or not she would be presenting any evidence, and even though she failed to specify what information she hoped to elicit on cross-examination of the state's witnesses. While arguing that she was entitled to make an opening statement on defendant's behalf, defense counsel conceded that she was unsure whether she would be presenting any evidence on defendant's behalf. Defense counsel told the trial justice that "at this point I cannot say for sure whether Mr. Bryant will testify." Furthermore, defense counsel also could

not definitively state whether or not she would be presenting·any other witnesses; rather, defense counsel spoke in a conditional manner: "If the State elected not to call Lissette, * * * the defense will be calling her."

Moreover, defense counsel also failed to specify what information she hoped to elicit on cross-examination of the state's witnesses. Instead, she merely stated that an opening statement would "outline for the jury the facts that I think will be elicited * * * on cross-examination" and that "it is through cross-examination of the State's witnesses that elicit my case and Mr. Bryant has a right to have me outline for this jury my expectation of what the evidence will show." At no point, however, did defense counsel specify exactly what affirmative evidence she reasonably expected to elicit on cross-examination.

Accordingly, pursuant to well-settled law in this jurisdiction, defendant had no right to make an opening statement prior to the introduction of evidence by the state, because he failed to clearly indicate to the trial justice that he would present any affirmative evidence.[7]

## II

### The Rule 602 Issue

█ The defendant's second argument on appeal is that it was an abuse of discretion for the trial justice to refuse to strike the testimony of Meraly pursuant to Rule 602 for lack of personal knowledge on her

---

other witness, [defense counsel], you can advise the Court and you can make an opening statement after the state has rested. Unless you can give me some assurances that you will call witnesses, I will not allow you at first and I think that is the rule of practice."
This statement is inconsistent with what this Court said in *State v. DePina,* 810 A.2d 768, 774 (R.I.2002), where we stated that the evi-

dence discussed during opening statements "may include affirmative evidence that the defendant reasonably expects to solicit on cross-examination of a witness."

7. We agree with the trial justice, however, that if, at the close of the state's case in chief, defendant had decided to present his own evidence, he would have been entitled to make an opening statement at that point.

part. We reject this contention, because it is our opinion that the trial justice did not abuse his discretion in making this evidentiary ruling.

■ Rule 602 provides:

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself or herself."

In applying Rule 602, this Court has held that a trial justice should exclude evidence for lack of personal knowledge only if he or she "finds that the witness could not actually have perceived the subject matter of his or her testimony." *Nhek*, 687 A.2d at 83. On the other hand, the trial justice should admit the evidence and allow the jury to assess the witness's credibility if a jury could find that the witness has personal knowledge of the facts to which he or she is testifying. *Spratt*, 742 A.2d at 1199; *see also Nhek*, 687 A.2d at 83 ("[E]ven if the competency question is a close call, the court should admit the testimony because the matter then becomes one of credibility and is therefore suitable for the jury.").

In the present case, the trial justice properly declined to strike Meraly's testimony for lack of personal knowledge because Meraly, who was present at Ms. Cuadras's apartment on the night of the alleged incident, could have perceived the events and statements about which she testified. Cross-examination of Meraly by defendant's attorney effectively brought out the fact that half of her testimony was based upon what she herself had observed on the night in question and half was based on what she had heard the other children say. On redirect examination Meraly specifically testified about exactly what she remembered seeing on the night of the incident. Given all of this testimony, a jury could find that Meraly had personal knowledge of much of the factual testimony that she had given. *See Spratt*, 742 A.2d at 1199. Moreover, because of the effective cross-examination and redirect examination that took place, the jury had sufficient information to assess Meraly's credibility and reliability and to determine the weight to be given to her testimony. We agree with the trial justice that, in cases such as this, "[t]he jury is sophisticated enough to separate what she saw and didn't see based on the testimony that [both sides] have elicited." Accordingly, the trial justice did not abuse his discretion in declining to strike Meraly's testimony.

## III

### The Testimony of Officer Leboeuf

■ The defendant's third argument on appeal is that his constitutional right to due process was violated when the trial justice refused to pass this case and declare a mistrial after the state attempted to elicit certain testimony from Officer Leboeuf. We disagree with this contention; it is our opinion that the trial justice did not abuse his discretion in deciding not to declare a mistrial.

The state's redirect examination of Officer Leboeuf included the following:

"Q. What did you say to Mr. Bryant?

"A. That he was under arrest.

"Q. Prior to that, you said—you testified—strike that. You testified you spoke to Lissette and you spoke to Mr. Bryant.

Did you ask him what occurred?

"Ms. McElroy: Objection.

"The Court: Overruled. The answer is 'yes' or 'no.'

"A. I believe, for the most part, I spoke [to] Lissette most of the time.

The most that I recall speaking was trying to—attempting to keep them both separated and calmed down at this point.

"Q. Now, at any point in time, did Mr. Bryant come to you and give you a statement?

"Ms. McElroy: Objection. I have a motion.

"The Court: Sustained.

"Ms. McElroy: I'd like to be heard at the side bar, Judge."

At the sidebar conference, defense counsel moved for a mistrial, asserting that the state, by posing this question to Officer Leboeuf, had violated the defendant's constitutional rights under the Fifth and Sixth Amendments to the United States Constitution. The trial justice refused to declare a mistrial, but instead immediately gave the jury a well-worded curative instruction,[8] which made it clear that the state's question was inappropriate and that the defendant had a right not to make any statement. The giving of this curative instruction, coupled with the fact that defense counsel's objection to the question was sustained before any answer was given, sufficed to eliminate any prejudice that may have arisen from the state's question. Accordingly, the trial justice did not abuse

his discretion in refusing to pass the case and declare a mistrial.

### Conclusion

For these reasons, the judgment of the Superior Court is affirmed.

---

8. The trial justice gave the jury the following curative instruction:

"All right. Ladies and gentlemen, first of all, that question is inappropriate. As you know, we talked about from the beginning of this case that this defendant has a right not to make a statement or participate in this trial, not to do anything. That same right exists at the time when there's an investigation going on as to whether or not there was any criminality going on. This officer has indicated, as far as she is concerned, she had not made the determination whether any crime was committed based on the knowledge she had at the time anyway. Even so, this defendant has a right not to testify, not only in this case, he also had a right not to give a statement. I don't know whether he gave a statement or not and I don't care whether he gave a statement or not. The fact is that he didn't have to give a statement both at the time of the incident nor does he have to testify at the time of trial. So, I'm going to ask you to just completely ignore that question as to whether or not she approached him and whether or not the officer talked to the defendant. It's not appropriate for this phase of the trial and it's a right that the defendant has not to talk with any police officer on the scene of a crime anyway, even if he didn't do anything or if he did do something. I'll ask you to put it out of your mind."