DECISION
Before this Court is the defendants' motion for summary judgment in this negligence action against the defendants, Royal Insurance Company of America, Federal Insurance Company, the American insurance Company, American Hospitality Concepts, Inc d/b/a the Ground Round, the Ground Round Inc., d/b/a the Ground Round, Mark A. Hallenbeck (Hallenbeck), and Ground Round employees Tara Belisle (Belisle), Christine Douthit (Douthit), Jason Webb (Webb) and Michael Martineau (Martineau). The plaintiffs objected to the motion; thereafter, this Court heard oral arguments on the motion on May 15, 2006. Jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 Facts and Travel
On May 29, 2001, Hallenbeck went to the Warwick Mall to purchase some items. Between approximately 7:00 p.m. and 7:30 p.m., he entered a restaurant in the mall called the Ground Round. Defendants' Exhibit, (Def. Ex.) # 2 at 107. He sat at the bar and ordered a twenty-two ounce draft beer. Plaintiffs'Exhibit, (Pl. Ex.) # 5E at 108. Hallenbeck did not order any food; rather, he consumed a disputed amount of alcohol.[1]
He remained there until restaurant's midnight closing time. Pl.Ex., # 7F at 138-39.
Over the course of his visit, Hallenbeck became loud and obnoxious. Def. Ex., # 1 at 22. He interjected himself into the conversations of other patrons and also made unsolicited comments about other patrons. Pl. Ex., # 11C at 81-82. One such patron was the decedent, Glenn A. Petersen (Petersen). Def. Ex., # 1 at 6. Petersen worked in the mall's maintenance department and he customarily stopped at the Ground Round for a drink before beginning his night shift. Id. Hallenbeck loudly likened Petersen to a pornography actor and later referred to him as "the little boy with a pipe." Def. Ex., # 1 at 22 and # 6 at 12.
Hallenbeck also spoke with Ground Round employee and bartender, Christine Douthit. Def. Ex., #2 at 158 and 162. Sometime between 8 p.m. and 9 p.m., Douthit became concerned about Hallenbeck and indicated that she would follow him home because he was drunk. Pl. Ex., # 7F at 97, #7b at 1 and 7E at 422-23. Later on, however, she changed her mind. At approximately 11 p.m., Webb, who worked as a cook for the Ground Round, asked manager Belisle to telephone the police to ask them to remove Hallenbeck and another individual from the premises. Def. Ex.,
# 4 at 127, #5 at 79. The manager refused to make the call. Def.Ex., # 4 at 129.
At approximately midnight, Belisle instructed Webb to escort Hallenbeck out of the bar. Pl. Ex., # 7B at 2 and # 7F at 138-39. Meanwhile, Hallenbeck was still expecting Douthit to follow him home. Pl. Ex., # 7F at 146-47. When Douthit informed Hallenbeck that she was not leaving with him, he went behind the bar and tried to hug her. Def. Ex., # 2 at 185. After she said "no" and pushed him away, he tried to hug her again. Id. She testified at a deposition that "[a]t the time, I felt assaulted."Pl. Ex., # 5E at 188. At that point, Hallenbeck left the bar and Douthit broke into tears. Pl. Ex., #5B at 21, # 5C at 28 and # 7C at 47. In a police report Webb stated that "[t]his is when she realized she was scared and that this guy was bad news."Pl. Ex., # 7B at 2.
Instead of exiting through the door leading to the parking lot, Hallenbeck exited the Ground Round through a door that led directly into the food court section of the mall. Def. Ex., # 5 at 152-53. Webb watched Hallenbeck as he exited through the wrong door. Id. The mall had been closed since 10 p.m. and the manager admits that this particular exit should have been locked earlier. Pl. Ex., 6C at 80-81 and 5D at 159. As soon as Hallenbeck went through the door, the door was locked so that Hallenbeck would not return. Pl. Ex., # 7F at 157.
Hallenbeck then attempted to exit the mall through some nearby doors, but he discovered that the doors were locked. Def. Ex.,
# 5 at 179. He started to curse and to bang on the doors. Pl.Ex., # 7B at 3. Meanwhile, Petersen and his co-worker, Peter Cervone (Cervone), heard the ruckus and approached Hallenbeck.Def. Ex., # 5 at 180-81. Meanwhile, Webb, who was watching the commotion from the Ground Round, asked Petersen to escort Hallenbeck out of the mall through another exit. Pl. Ex., # 7F at 167-68. Webb testified at Hallenbeck's murder trial that Hallenbeck "obviously did not, you know, seem very happy at that point and I did not want him to come back in." Pl. Ex., # 7C at 50.
Petersen told Hallenbeck that the mall was closed. Id.
Hallenbeck swore at the two maintenance workers and began to walk towards them. Pl. Ex., # 7F at 163. Petersen proceeded to show Hallenbeck out of the mall and began to lead the way to another exit. Pl. Ex., # 7F at 182. At this point, six foot, 225 pound Hallenbeck began to kick and punch Petersen, who was five four inches in height, and weighed 176 pounds. Id., Pl. Ex., # 9 at 857 and Autopsy Report. According to Cervone, Hallenbeck threw Petersen to the ground "like a ragdoll" and that he knocked him down four or five times more. Pl. Ex., # 10 at 240 and 242. Hallenbeck then pinned Petersen to the floor and repeatedly punched him in the face. Id. at 245. Hallenbeck then reached for a knife that Petersen used for work-related purposes and kept in a sheath attached to his belt. Id. at 248.
Meanwhile, Webb tried to come to the rescue by jumping on Hallenbeck's back in a bear hug. Id. Webb managed to disarm Hallenbeck of the knife, but not before Hallenbeck fatally stabbed Petersen in the groin. Id. 251 and 253. Hallenbeck subsequently was convicted of manslaughter and was ordered to serve twenty years of a thirty-year sentence of imprisonment.See State v. Hallenbeck, 878 A.2d 992, 998 (R.I. 2005). The remaining ten years were suspended with probation. Id. The Rhode Island Supreme Court upheld his conviction. Id.
The plaintiffs filed the instant five count civil action against the defendants seeking damages for the wrongful death of Petersen. Count I is based upon negligence; premises liability, negligent hiring, training and/or supervision and wrongful death; Counts II and III claim loss of consortium and loss of society and companionship; Count IV asserts negligent violation of General Laws 1956 chapter 14 of title 3, the Rhode Island Liquor Liability Act (the Act); and Count V sets forth claims based upon reckless violation of the Act.
With respect to the negligence counts, the defendants allege that the plaintiffs cannot establish as a matter of law that either the Ground Round restaurant or its employees owed a duty of care to Petersen. They further maintain that the plaintiffs cannot establish as a matter of law that the defendants' actions proximately caused Petersen's death. Finally, the defendants assert they are entitled to summary judgment on the Liquor Liability claims because, they contend, Hallenbeck was not visibly intoxicated when he left the premises.
 Standard of Review
It is well settled that "[s]ummary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v. BurrillvilleRacing Association, 603 A.2d 317, 320 (R.I. 1992) (citingSteinberg v. State, 427 A.2d 338 (R.I. 1981); Ludwig v.Kowal, 419 A.2d 297 (R.I. 1980)); see also Super. Ct. R. Civ. P. Rule 56. During a summary judgment proceeding "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Palmisciano,603 A.2d at 320 (citing Lennon v. MacGregor, 423 A.2d 820 (R.I. 1980)). The Court's purpose during the summary judgment procedure is issue finding, not issue determination. Industrial NationalBank v. Peloso, 397 A.2d 1312, 1313 (R.I. 1979) (citingO'Connor v. McKanna, 359 A.2d 350 (R.I. 1976); Slefkin v.Tarkomian, 238 A.2d 742 (R.I. 1968)). Thus, the only task of a trial justice in ruling on a summary judgment motion is to determine whether there is a genuine issue concerning any material fact. Industrial National Bank, 397 A.2d at 1313
(citing Rhode Island Hospital Trust National Bank v. Boiteau,376 A.2d 323 (R.I. 1977)).
However, "a party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." Weaver v. Am. Power Conversion Corp.,863 A.2d 193, 197 (R.I. 2005) (quoting Accent Store Design, Inc.,674 A.2d 1223, 1225 (R.I. 1996)). Thus, "they have an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." Bourg v. Bristol Boat Co.,705 A.2d 969 (R.I. 1998) (citing St. Paul Fire Marine Insurance Co. v.Russo Brothers, Inc., 641 A.2d 1297, 1299 (R.I. 1994)). Furthermore, "[t]he purpose of the summary-judgment procedure is to identify disputed issues of fact necessitating trial, not to resolve such issues." Weaver, 863 A.2d at 197 (quoting Rotelliv. Catanzaro, 686 A.2d 91, 93 (R.I. 1996)).
 Analysis 1. Duty of Care
The defendants assert that they are not liable to the plaintiffs on the negligence-related claims (Counts I-III) because there is no evidence that they owed a duty of care to Petersen. They maintain that since Petersen was not a patron of the restaurant at the time of the assault, there existed no special relationship between the defendants and Petersen giving rise to a duty of care. See Martin v. Marciano, 871 A.2d 911,915 (R.I. 2005) (recognizing a special relationship under common law "between those who provide intoxicants and those whom they serve").
The plaintiffs contend that there was a special relationship between the defendants and Petersen because the attack occurred in a common area of the mall in which the defendants had an ownership interest, and also because they had control over how Hallenbeck exited the restaurant. Furthermore, they maintain that the defendants owed a duty of care to Petersen because he was attacked during the course of performing a service for the Ground Round; namely, he allegedly was escorting Hallenbeck out the mall upon Webb's request. They assert that given Hallenbeck's earlier unruly conduct, the later confrontation was foreseeable and could have been avoided.
In this jurisdiction, "to state a viable claim for negligence, the complainant must allege facts showing the existence of a legal duty of care owed by defendant to plaintiff." Soave v.Nat'l Velour Corp., 863 A.2d 186, 188 (R.I. 2004) (citingFerreira v. Strack, 636 A.2d 682, 685 (R.I. 1994)). Determining "[w]hether such a duty of care runs from a defendant to a plaintiff is a question of law for the court to decide." Soave,863 A.2d at 188 (citing Hennessey v. Pyne, 694 A.2d 691, 697
(R.I. 1997)). In situations where "the court concludes that no duty exists, `then the trier of fact has nothing to consider and a motion for summary judgment must be granted.'" Soave,863 A.2d at 188 (quoting Ferreira, 636 A.2d at 685). However, "[a]s there is `[n]o clear cut formula' for determining the existence of a duty, the court will make the determination on a case-by-case basis." Martin, 871 A.2d at 915 (quoting Volpe v.Gallagher, 821 A.2d 699, 705 (R.I. 2003)).
In making such a determination, this Court "will consider all relevant factors, including the relationship between the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations[.]" Martin,871 A.2d at 915. In addition, this Court should consider the "foreseeability of harm to the plaintiff." Id. (quoting Banks v. Bowen'sLanding Corp., 522 A.2d 1222, 1225 (R.I. 1987)). In determining foreseeability, "courts should look to the totality of the circumstances . . . applying a balancing approach that `acknowledges that duty is a flexible concept, [that] seeks to balance the degree of foreseeability of harm against the burden of the duty to be imposed.'" Volpe, 821 A.2d at 716. With respect to "the determination of duty, the foreseeability inquiry considers generally whether `the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.'" Martin, 871 A.2d at 917 (quoting Banks,522 A.2d at 1226-27).
The issue in this case is whether the defendants owed Petersen a duty to protect him from unreasonable harm. Comment (e) of the Restatement (Second) Torts § 314A (1999) "explains that one who is under such a duty `is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate. . . .'" Martin, 871 A.2d at 917. The essential "`cause to anticipate' the assault may arise from 1) actual or constructive knowledge of the assailant's violent nature, or 2) actual or constructive knowledge that an atmosphere of violence exists in the [location of the assault].'" Id. (quoting W.B.Crain v. Cleveland Lodge 1532, Order of Moose, Inc.,641 So.2d 1186, 1189 (Miss. 1994)). Furthermore, "`the specific kind of harm need not be foreseeable as long as it was foreseeable that there would be harm from the act which constituted the negligence, provided it was foreseeable that there would be violence toward others.'" Martin, 871 A.2d at 917 (quotingPollard v. Powers, 50 Mass.App.Ct. 515, 738 N.E.2d 1144, 1146
(2000)). If the harm was foreseeable, then "it is for the jury to determine whether the assault was such a remote possibility that it was an intervening cause of harm." Id.
This Court concludes that the defendants owed Petersen a duty to protect him from unreasonable harm. Webb testified in a deposition that Hallenbeck became upset and used foul language when he discovered that he could not exit from the food hall.Def. Ex. # 5 at 158 and 163. Webb also agreed that when Petersen first approached him, Hallenbeck was really upset, swearing, banging vigorously on the exit doors and causing a big commotion; however, Webb did not offer to let him return to the Ground Round because he was worried about the vulgar language.Id. at 163 and 179.
Marc J. Cormier was a patron of the Ground Round on the night in question. He testified in a deposition that Hallenbeck appeared to be "looking for trouble" and that [b]y antagonizing people and the comments that he was making, it seemed as though he was looking for a reaction, negative reaction, which ultimately could lead to a physical confrontation." Pl. Ex., # 11D at 29. He further testified that "I believe that Mr. Hallenbeck was intoxicated." Id. at 33. Another patron, Brianna P. Maguire testified that she saw Douthit look "visibly upset and appeared to be scared of [Hallenbeck] . . . who was bothering her." Pl. Ex., # 16B at 10. She further stated that Hallenbeck made her "nervous" and that the way he looked and acted was "creepy and menacing." Id. at 14.
Douthit testified that after Hallenbeck twice attempted to hug her, she put her arms up and asked him not to touch her. Def.Ex. # 3 at 185. In response, she testified that "he backed away, looked kind of embarrassed, and he's, `Sure that's what you want?' I said `Yeah.' And he just kind of threw his hands up, and said, `Okay,' and left." Id. At his trial for murder, Hallenbeck testified he had been attracted to Douthit and that after she rebuffed his advances, he was embarrassed and "left with [his] tail between [his] legs." Def. Ex. # 7 at 944 and 946.
Considering that "it is common knowledge that the use of intoxicants frequently unduly excites the tempers, emotions and actions of those who indulge in them[,]" a reasonable jury could conclude that based upon Hallenbeck's earlier conduct, it was foreseeable that he might physically assault Petersen, particularly where he already had confronted him earlier in the night. Martin, 871 A.2d at 917. Furthermore, not only did the defendants have a duty to protect Petersen from unreasonable harm, they also had a duty to exercise reasonable care to control Hallenbeck's conduct.
Generally, a "possessor of land owes to those outside the premises a duty to use reasonable care to prevent them from being injured as a result of activities on their property." Volpe,821 A.2d at 705. Such a "duty extends to activities conducted by third parties on the possessor's property if the possessor has the power to control such activities." Id. Thus, "[a] special relationship under Section 318 [of the restatement] may arise between the possessor of land and those allowed on the land because of the possessor's power of control over those allowed to enter."[2] Id. at 706 (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 57, at 392 (5th ed. 1984)). Furthermore, "[t]he special relationship may arise under Section 318 when the landowner knew or should have known of the ability to control persons causing injury to [another] and the necessity and opportunity to exercise such control, and if the facts establish a threshold showing of such knowledge, then the jury decides these questions." Volpe, 821 A.2d at 706. Thus,
 "Under § 318 of the restatement, when possessors of property allow one or more persons to use their land or personal property, they are, if present, under a conditional duty to exercise reasonable care to control the conduct of such users to prevent them from intentionally harming others or from conducting themselves on the possessors' property in a manner that would create an unreasonable risk of bodily harm to others. Two conditions, however, must exist for this duty to arise: the possessors of the property must (1) know or have reason to know that they have the ability to control the person(s) using their land, and (2) know or should know of the necessity and opportunity for exercising such control. Id.
(internal citations omitted).
In the instant case, it is undisputed that Hallenbeck left the Ground Round through a door leading into the interior of the mall. It also is undisputed that the mall already had closed for the night when Hallenbeck left the restaurant. Webb stated that he watched Hallenbeck leave and that the door immediately was locked to prevent him from returning. He also stated that he told Petersen to show Hallenbeck out of the mall.
It is clear from the foregoing that the Ground Round employees had the ability to control Hallenbeck. They simply could have locked the door leading to the interior of the mall. Moreover, once they realized that he had exited into the mall, they could have called him back and redirected him to the other exit door; instead, the door through which Hallenbeck had left immediately was locked.
For the foregoing reasons, this Court denies the defendants' motion for summary judgment on Counts I-III. It will be for the jury to decide whether the defendants' actions constituted negligence and whether result was reasonably foreseeable.
2. Intoxication
The defendants assert that they are entitled to summary judgment on Counts IV and V "because the undisputed facts demonstrate that Hallenbeck was not visibly intoxicated, as required by the Liquor Liability Act." The plaintiffs vigorously oppose the motion, stating that there are enough genuine issues of material fact to preclude the granting of this motion.
Section 3-14-6, entitled Liability for negligent service of liquor provides in pertinent part:
 "(b) A defendant . . . who negligently serves liquor to a visibly intoxicated individual is liable for damages proximately caused by the individual's consumption of the liquor.
 (c) Service of liquor . . . to an intoxicated individual is negligent if the defendant knows, or if a reasonable and prudent person in similar circumstances would know that the individual being served . . . is visibly intoxicated."
Section 3-14-7, entitled Liability for reckless service of liquor, provides in pertinent part:
 "(b) A defendant, as defined in § 3-14-5, who recklessly serves liquor to a visibly intoxicated individual is liable for damages proximately caused by that individual's consumption of the liquor. (c)(1) Service of liquor is reckless if a defendant intentionally serves liquor to an individual when the server knows that the individual being served is a minor or is visibly intoxicated, and the server consciously disregards an obvious and substantial risk that serving liquor to that individual will cause physical harm to the drinker or to others.
 (2) For the purposes of this chapter, the disregard of the risk, when viewed in light of the nature and purpose of the server's conduct and the circumstances known to him or her, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation."
In order to prevail in an action brought under the Act, a person must have been "visibly intoxicated." Intoxicated is defined as
 "[A] substantial impairment of a person's mental or physical faculties as a result of drug or alcoholic beverage use so as to diminish that person's ability to think and act in a manner in which an ordinary prudent and cautious person, in full possession of his or her faculties and using reasonable care, would act under like circumstances. § 3-14-3(c).
Because "[i]ntoxication in many instances is a condition that may not be detected[,]" in order to prevail on a claim under the Act, it must be shown that the server "knew or should have known that the consumer was inebriated." Embrey v. Ortiz, 538 A.2d 1002,1005 (R.I. 1988). This is because "[t]he server cannot be expected to make a determination of sobriety unless the server is familiar with the drinker's previous level of alcohol consumption or unless the drinker manifests such telltale signs of intoxication as swaying or slurred speech." Id.
In the instant matter, there are genuine issues of material fact as to whether Hallenbeck was intoxicated. In his statement to the police, Webb stated that Hallenbeck "seemed drunk" when he left the bar. Pl. Ex. # 7A. Webb also stated that at approximately 9 p.m., Douthit told Webb that she was going to follow Hallenbeck home because he had told her he was drunk. Pl.Ex. # 7F at 97. Cervone testified in a deposition that while he was at the bar, Hallenbeck "was loud and very obnoxious, a little, slurring a little bit, seemed to be." Defendants'Exhibit (Def. Ex.) # 1 at 22. He further described Hallenbeck as "very loud" and "very rude." Id.
As previously stated, Douthit testified that after Hallenbeck twice attempted to hug her, she put her arms up and asked him not to touch her. Def. Ex. # 3 at 185. After being rebuffed by Douthit, Hallenbeck felt shamed; thereafter, he immediately left the Ground Round. Def. Ex. # 7 at 944 and 946. Cormier stated that he believed " Hallenbeck was intoxicated." Pl. Ex., # 11D at 33. He formed this opinion in part based upon the way Hallenbeck was slouching, "[h]is mannerisms, the way he was leaning." Id. at 17. Various witnesses stated that Hallenbeck was loud, rude, and obnoxious while he was at the bar.
It is clear from the foregoing that there are sufficient genuine issues of material facts from which a jury could infer that Hallenbeck was intoxicated when he killed Petersen. Consequently, this Court denies the defendants' motion for summary judgment on Counts IV and V.
 Conclusion
Based on the preceding analysis, this Court denies the defendants' motion for summary judgment on Counts I-V of the amended complaint. The case shall proceed to a trial on the merits.
Counsel shall prepare an order consistent with this decision.
[1] The defendants claim that Hallenbeck drank two twenty-two ounce beers and almosone twelve ounce beer. Def. Ex., #2 at 125. The plaintiffs assert that he consumed between five and seven draft beers. Pl. Ex., # 5A.
[2] Section 318 of the Restatement of Torts provides:
 "If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
 (a) knows or has reason to know that he has the ability to control the third person, and
 (b) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) Torts § 318 at 126-27 (1965).